LaVonne ANDERSON, Respondent,

v.

HUNTER, KEITH, MARSHALL & CO.,
INC., Appellant.

Nos. C1–86–1039, C8–86–1619.

Court of Appeals of Minnesota.

Feb. 17, 1987.

Review Granted April 29, 1987.

J. Dennis O'Brien, Dayle Nolan, William R. Skallerud, Lefevere, Lefler, Kennedy, O'Brien & Drawz, Minneapolis, for respondent.

Frederick E. Finch, Robert C. Boisvert, Jr., Fredrikson & Byron, P.A., Minneapolis, for appellant.

Heard, considered, and decided by RANDALL, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

WOZNIAK, Judge.

This appeal involves a discriminatory discharge claim brought by LaVonne

Anderson against her former employer, Hunter, Keith, Marshall & Co. (HKM). HKM appeals from the order denying its motion for a new trial, an order which let stand a $60,000 award to Anderson for damages she suffered when HKM discharged her for reasons related to her pregnancy, a violation of Minnesota's Human Rights Act, Minn.Stat. § 363.03, subd. 1(2)(b), (c), and subd. 1(5) (1982). HKM also appeals from the court's award of nearly $60,000 to Anderson's attorneys for their fees in prosecuting this action. HKM raises several issues on appeal. Anderson filed a notice of review, seeking review of her damage award. We affirm.

## FACTS

HKM is a small investment banking firm which was founded in 1975 by Andrew Hunter and Robert Keith. In November 1978, they hired LaVonne Anderson for a secretarial position. Before coming to HKM, Anderson had been a legal secretary for six years in a large Minneapolis law firm. When Anderson interviewed for the position, Keith asked her if she was married and if she planned to have children. He wanted to know whether Anderson was going to stay in the area, whether her husband was going to work here, and whether Anderson would be able to continue to work. Anderson told him she had no immediate plans to have a family.

Anderson served as a secretary to both Hunter and Keith and was responsible for typing, filing, invoicing, making travel arrangements, and answering phones. Anderson performed her duties effectively during 1979 and 1980. At her year-end performance review in December 1979, Anderson received a 10% salary increase and a $1,000 bonus. In December 1980, Anderson again received a 10% salary increase and a $1,000 bonus, even though Keith criticized her for not organizing a filing system.

In 1981, HKM experienced a four-fold increase in its business transactions. HKM hired another investment banker in late 1981, and Anderson also served as his secretary. At her performance review in December 1981, Anderson testified she was criticized for not keeping a better filing system. She also said Keith commented that her attitude was different and that it was no longer fun in the office. Keith testified that during the review he covered several areas where Anderson needed improvement, including her typing, filing, invoicing, travel arrangements, and her attitude. Keith said these deficiencies were first discussed with Anderson at a mid-year review in June or July of 1981. Keith and Hunter suggested Anderson use a typing service or get a word processing system installed to ease the workload. Anderson, however, denied she met with Keith or Hunter at that time to discuss her performance.

Despite their criticisms, Hunter and Keith again awarded Anderson a 10% salary increase and a $1,000 bonus. Hunter testified that he wanted to fire Anderson at the end of 1981, but that Keith persuaded him that they should keep her because she was experiencing some financial difficulty at the time because her husband was unemployed. Keith testified that they gave Anderson $1,000 to keep her from becoming more hostile toward them and to help her in her financial difficulty.

After her 1981 performance review, Anderson met again with Hunter and Keith on January 6, 1982, to present them with a job description she had prepared. She submitted the description to support her request for a larger bonus. Keith and Hunter denied her request, testifying that they again pointed out her shortcomings. After the January 6 meeting, Keith said that Anderson lost all interest in her job. Anderson testified, however, that after the meeting she worked harder because business was so brisk. Another employee testified that after Anderson's performance review, Anderson became abrupt, seemed unhappy, and did only what was necessary.

During the week of February 8, 1982, Hunter, Keith, and Marshall held a board of directors' meeting in the living room of a condominium in Steamboat Springs, Colorado. At the meeting, a decision was allegedly made to fire Anderson before the end

of February. No reference to this decision appears in the minutes, however, and neither Hunter nor Keith fired Anderson when they returned from their Colorado meeting.

In late February or early March, Anderson told Hunter and Keith that she was pregnant. Anderson told them she planned to take a two- to three-month leave of absence and then return to work. Keith responded that it would be inconvenient to have Anderson out of the office for that amount of time. Keith also told another employee that Anderson's maternity leave would inconvenience the office. HKM had no written policy regarding leaves of absence.

Anderson testified that Keith told her to find a temporary replacement, and Anderson referred Nancy Whaylen to him. Whaylan testified that Keith told her that HKM wanted to permanently replace Anderson because of problems employers have with mothers who decide not to return to work from their leaves of absence, which then presents a problem for employers to find competent replacements on short notice. Keith denied making this statement and testified that he told Whaylen he needed a permanent replacement because Anderson was choosing not to return to work.

Despite their alleged decision to fire Anderson, Hunter and Keith decided to let her stay until the time she took her maternity leave and tell her then she was being fired. To spare her feelings, Hunter and Keith devised a story to tell outsiders that Anderson wanted to stay home to care for her family. This story was devised without regard to what Anderson wanted to do. Keith said nothing to Anderson about this plan because, as he testified, he thought her hostility would increase to an unbearable level.

On May 24, 1982, Hunter and Keith interviewed Darlene McNalley as a possible replacement for Anderson. They interviewed her away from their offices so Anderson would not know they were seeking a permanent replacement. They offered McNalley a permanent position to begin when Anderson left later that summer. On June 16, 1982, Keith told Anderson she was being fired because her performance had not improved. The termination, however, would not take effect until Anderson left later that summer. Anderson testified that Keith told her he was replacing her because HKM wanted to protect itself in the event she decided not to return to work after her leave. Anderson said she asked to return but was told she could not.

On July 27, 1982, Anderson's doctor ordered her to stop working because working might jeopardize her pregnancy. She left HKM's employ that day and gave birth to twins on August 26, 1982, approximately one month prematurely. Darlene McNalley began working as soon as Anderson left. She testified that the office was in chaos when she started work.

On October 11, 1982, Anderson's doctor gave her permission to return to work, and she began looking for a new job. She prepared a resume and obtained two letters of reference from her former employers at the law firm where she worked before joining HKM. She registered with an employment agency and contacted the Hennepin County Bar Association Placement Service (HCBAPS). She also responded to employment advertisements in the newspapers.

Anderson was unable to find a position paying a salary comparable to what she was receiving at HKM. Anderson was earning approximately $20,000 per year when she was fired. She testified that she sought work in the $18,000 to $20,000 salary range, including work as a legal secretary. In her deposition, however, she said she had not contacted any law firms because she was not interested in returning to the law. Marsha McDonough, the former manager of the HCBAPS, testified that a person with Anderson's experience and references should not have had difficulty finding a legal secretary position in the $18,000 to $20,000 a year range. Unable to find acceptable fulltime work, Anderson accepted part-time work and earned approximately $2,400 and $6,000 in 1983 and 1984, respectively.

Anderson sued HKM, alleging she was fired because she was pregnant. The trial court found that HKM had mixed motives for firing Anderson, motives generated by permissible as well as impermissible reasons. The court applied the standard test for analyzing disparate treatment cases and found that Anderson's pregnancy was a "discernible, discriminatory, and causative factor" in HKM's firing her. The court also found that Anderson was not entitled to damages beyond the end of 1983 and, accordingly, awarded her $60,000 in compensatory damages. The court also awarded her attorneys $59,866.25 for their fees in prosecuting the case.

## ISSUES

1. Did the trial court err in applying *McDonnell Douglas*'s three-step analysis to this disparate treatment case in which the court found that HKM had mixed motives for firing Anderson?

2. Is the evidence sufficient to support the trial court's finding that Anderson's pregnancy more likely than not motivated HKM's decision to fire her?

3. Is the evidence sufficient to support the trial court's finding that Anderson was not entitled to damages beyond the end of 1983?

4. Did the trial court abuse its discretion in refusing to award Anderson treble compensatory damages?

5. Did the trial court abuse its discretion in awarding Anderson her attorneys' fees?

## ANALYSIS

1. The Minnesota Human Rights Act prohibits an employer from discharging or discriminating against a person because of that person's gender. Minn. Stat. § 363.03, subd. 1(2)(b), (c) (1982). The Act also prohibits disparate treatment of pregnant women. *Id.*, subd. 1(5). "The crux of a disparate treatment claim involving an employer's decision to discharge an employee is that the employer is treating that employee less favorably than others on the basis of an impermissible classifica-

tion." *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 442 (Minn. 1983); *see Schlemmer v. Farmers Union Central Exchange, Inc.*, 397 N.W.2d 903 (Minn.Ct.App.1986). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), the United States Supreme Court established a three-part analysis for adjudicating disparate treatment claims in Title VII actions. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (explaining the *McDonnell Douglas* analysis). The Minnesota Supreme Court has held that in employment cases involving claims of disparate treatment brought under the Minnesota Human Rights Act, trial courts must explicitly apply the three-step *McDonnell Douglas* analysis. *Sigurdson v. Isanti County*, 386 N.W.2d 715, 722 (Minn.1986).

Under this analysis, the plaintiff has the initial burden of establishing a prima facie case of disparate treatment. If the plaintiff succeeds, a presumption is created that the defendant unlawfully discriminated against the employee, and the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the plaintiff's treatment. The defendant's burden is one of production only: "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094 (citation omitted). If the defendant meets its burden, the presumption created by the prima facie case is rebutted, and the plaintiff must then prove that the defendant's reasons were not the true reasons for the plaintiff's treatment. The plaintiff succeeds here "either directly by persuading the court that a discriminatory reason *more likely* motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095 (citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26 (emphasis added).

The trial court expressly used the *McDonnell Douglas* analysis in this case and found that Anderson established a prima facie case of discriminatory treatment. It also found that HKM produced evidence of a legitimate reason for firing Anderson, namely Anderson's poor job performance. Neither party disputes the court's findings at the first two steps of the analysis. At the third step, however, the court decided to treat the case as one of mixed motives, explaining that HKM had both lawful and unlawful reasons for firing Anderson. Rather than make an express finding that HKM's reason for firing Anderson was a pretext, the court found that Anderson's pregnancy was a "discernible, discriminatory, and causative factor" motivating HKM to fire her. In an accompanying memorandum, the court discussed the *McDonnell Douglas* test and noted that at the third level of the analysis Anderson "clearly carried her ultimate burden for persuasion and convinced the Court that, though defendant's motives were mixed, plaintiff's pregnancy was a discernible, discriminatory, and causative factor in defendant's discharge of [her]."

No Minnesota case has established the standard for analyzing a mixed-motive case under the Minnesota Human Rights Act. Minnesota adheres to the principles developed under Title VII of the 1964 Civil Rights Act in construing the Minnesota Human Rights Act. *E.g., Danz v. Jones,* 263 N.W.2d 395, 398–99 (Minn.1978). Although the United States Supreme Court has not expressly addressed the mixed-motives issue in an individual Title VII case, the Eighth Circuit Court of Appeals in *Bibbs v. Block,* 778 F.2d 1318, 1323 (8th Cir.1985), adopted the "same decision" test for such cases. Under this test, a plaintiff establishes a violation of Title VII by proving that a discriminatory motive was a factor in the employment decision, but an employer can then avoid damages if it can prove it would have made the same decision regardless of its discriminatory motives. *See id.* at 1323–24. HKM urges this court to adopt this test. We decline to do so.

Title VII "prohibits *all* discrimination in employment based upon race, sex, and national origin." *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096 (emphasis added). Furthermore, Title VII was amended in 1978 by the Pregnancy Discrimination Act (PDA), which added pregnancy to the definition of sex discrimination prohibited by Title VII. 42 U.S.C. § 2000e(k) (1978). As the United State Supreme Court recently noted in *California Federal Savings and Loan Association v. Guerra,* —— U.S. ——, ——, 107 S.Ct. 683, 692, 93 L.Ed.2d 613 (1987): "Congress intended the PDA to provide relief for working women and *to end discrimination against pregnant women.*" (Emphasis added; footnote omitted.) The PDA extends the principles and objectives of Title VII to cover pregnancy.

Here, the court found that Anderson's pregnancy was a discernible factor in HKM's decision to fire her. Using the term "discernible factor" does not establish a new test, but simply restates the *Burdine* test in a different way. *Bibbs,* 778 F.2d at 1325–26 (Lay, J., concurring). As Judge Lay explained in *Bibbs:*

> [W]hen race is shown to have been a factor *in* the employment decision, * * * the same-decision test is inappropriate under the principles of *Burdine.* Here, plaintiff has done far more than put forth a prima facie case of discrimination. He has successfully proven that race was a discriminatory factor *in* his employer's refusal to promote him. Rather than requiring proof that race was a "substantial" as opposed to a "minor" factor in the decision, Title VII simply requires that a plaintiff prove his or her claim of unlawful discrimination by persuading the court that "a discriminatory reason more likely [than not] motivated the employer." *Burdine,* 450 U.S. at 256 [101 S.Ct. at 1095]. Nothing more is required of a plaintiff to establish liability under Title VII.

*Id.* at 1327 (emphasis in original). The trial court considered *Bibbs'*s "same decision" test, but rejected it in favor of the *McDonnell Douglas* test as explained in *Burdine.* We approve of the trial court's approach.

A mixed-motive case should be tried under the same test as that set forth in *McDonnell Douglas* and *Burdine*, which is the test currently used for any disparate claim brought under the Minnesota Human Rights Act. *E.g., Sigurdson*, 386 N.W.2d at 719–20; *Hubbard*, 330 N.W.2d at 441–42. To some extent, every claim of disparate treatment raises questions of mixed motives. Rarely will an employer fail to offer a legitimate business reason for its actions. Once a legitimate reason has been offered, the employee has the final burden of demonstrating that the proffered reason was not the true reason for the employer's actions. The trial court's task is to determine whether the employee has met this burden. The court's characterization of the employer's motives is immaterial at the third stage of the analysis. The question is solely whether or not the court is persuaded that the employee has been the victim of intentional discrimination. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Given the principles and objectives underlying Title VII and the Minnesota Human Rights Act, the trial court did not err in applying the *Burdine* test to this mixed-motive case.

■ HKM claims that the trial court nevertheless erred when it failed to explicitly address the issue of pretext at the third stage of the *McDonnell Douglas* test. *Sigurdson*, 386 N.W.2d at 721. The trial court did not use express language to find either "pretext" or that a discriminatory reason "more likely" than not motivated HKM. *Sigurdson*, however, does not require rigid and mechanical application of the test. *Id.* "[T]he three-part analysis is merely a tool that provides 'a sensible, orderly way to evaluate the evidence.'" *Id.* at 722 (quoting *Furnco · Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)). The trial court conducted its analysis within the *McDonnell Douglas* framework. The court clearly appreciated the nature of Anderson's burden and found that Anderson had carried her ultimate burden of persuasion and had convinced the court that her pregnancy was a discernible, discriminatory, and causative factor in HKM's decision to fire her. In other words, Anderson sustained her ultimate burden by persuading the court that HKM was more likely than not motivated by a discriminatory reason. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Accordingly, Anderson established HKM's liability under the Minnesota Human Rights Act.

■ 2. HKM claims, however, that the evidence is insufficient to support the court's finding that Anderson's pregnancy was a factor motivating HKM to fire her. HKM argues that Anderson was fired for legitimate reasons unrelated to her pregnancy. On appeal, the trial court's findings will not be disturbed if they are reasonably supported by the evidence as a whole. *Hubbard*, 330 N.W.2d at 441. The trial court's decision will be reversed only when the result is clearly erroneous. *Id.* A trial court's findings are clearly erroneous when they are without substantial evidentiary support or are induced by an erroneous view of the law. *Anda Construction Co. v. First Federal Savings and Loan Association*, 349 N.W.2d 275, 277 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Sept. 5, 1984).

The evidence reveals that when Anderson initially interviewed for the position, Keith asked her about her plans to have children. Keith said he wanted to know whether she would be able to continue working. Anderson was a qualified and competent secretary when she joined HKM in December 1978. She received good performance reviews in 1979 and 1980 and was given a 10% salary increase and a $1,000 bonus each year. HKM said Anderson's ability to perform her work deteriorated during 1981 when business increased sharply. Nevertheless, at the end of 1981 HKM again awarded Anderson the same 10% salary increase and $1,000 bonus that she had received when her performance was good.

Hunter and Keith testified they decided to fire Anderson before the end of February 1982. This decision was allegedly made at their board of directors' meeting in Colorado in early February. The minutes

from the meeting do not mention this decision. Moreover, neither Hunter nor Keith had fired Anderson by late February or early March at which time she told them she was pregnant and wanted to take two or three months maternity leave. Keith responded to this news by telling her that her absence would inconvenience the office.

Keith interviewed Nancy Whaylen who was interested in replacing Anderson while she was on leave. Keith told Whaylan, however, that he was not interested in a temporary replacement, but wanted to permanently replace Anderson to protect HKM in the event Anderson chose not to return to work after her maternity leave. Hunter and Keith interviewed Darlene McNalley to permanently replace Anderson, but they interviewed her away from HKM's offices so Anderson would not know they were replacing her. McNalley was offered and accepted a job with HKM, and shortly thereafter, Keith told Anderson she was being fired because her performance had not improved. Anderson asked to return to work after her leave, but was told she could not.

The trial court's finding that Anderson's pregnancy was a discernible, discriminatory, and causative factor in her discharge is not clearly erroneous. The evidence as a whole amply supports such a finding. Even if HKM's motives were mixed, the evidence shows that HKM was more likely motivated by Anderson's pregnancy than by her job performance when it decided to fire her.

3. The trial court also found that Anderson could have obtained work comparable to her work at HKM not later than the end of 1983. Accordingly, the court awarded damages by calculating her compensation from the time she left HKM to the end of 1983. Both HKM and Anderson challenge the court's finding on damages. HKM argues that Anderson could have found comparable work by the end of 1982 and is not entitled to damages for 1983. Anderson, however, claims that she is entitled to compensation through her trial in September 1985.

The general purpose of the Minnesota Human Rights Act is to place victims of discrimination in the same position they would have been in had no discrimination occurred. *Brotherhood of Railway and Steamship Clerks, Lodge 364 v. State of Minnesota Department of Human Rights*, 303 Minn. 178, 195, 229 N.W.2d 3, 13 (1975). Claimants, however, have a duty to minimize damages by using "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. E.E. O.C.*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (Title VII claimants have a duty to minimize damages). Although claimants need not go into another line of work, accept a demotion, or take a demeaning position, they forfeit their right to back pay if they refuse a job substantially equivalent to the one they were denied. *Id.* at 231–32, 102 S.Ct. at 3065–66.

Anderson's testimony is conflicting concerning her efforts to obtain a legal secretary position. In her deposition she said she had not looked for a law-related position, while at trial she said she had. The evidence, however, shows Anderson prepared a resume, secured letters of recommendation, registered with an employment agency, contacted the Hennepin County Bar Association Placement Service, and responded to newspaper advertisements. The trial court found that by reasonable effort Anderson could have obtained comparable work by the end of 1983. The court's finding will be reversed only if clearly erroneous and unsupported by the evidence. Although the court might have been justified in making a more favorable finding for either HKM or Anderson, the evidence nevertheless reasonably supports the court's finding, and we simply cannot say the finding is clearly erroneous.

4. Anderson claims the trial court abused its discretion in refusing to award her treble damages. Minnesota Statute Section 363.071, subdivision 2 was amended in 1984 to provide for a damage award up to three times the actual damages sustained. 1984 Minn.Laws, ch. 567, § 5 (codified at Minn.Stat. § 363.071, subd. 2

(1986)). The effective date of the amendment was August 1, 1984. *Id.* at § 10 (not codified). Anderson's last day at HKM was July 27, 1982, two years before the effective date of the amendment.

In Minnesota, "[n]o law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature." Minn.Stat. § 645.21 (1984). New provisions in a statute are construed as effective "only from the date when the amendment [becomes] effective." Minn.Stat. § 645.31, subd. 1 (1984). Here, the effective date of the amendment was August 1, 1984, and nothing indicates the legislature intended the amendment to apply retroactively. Anderson is not entitled to treble damages under the amended provision.

█ 5. Finally, HKM contests the trial court's award to Anderson of nearly $60,000 for attorneys' fees. Minnesota Statute Section 363.14, subdivision 3 (1984) allows the trial court to award the prevailing party a reasonable attorney's fee as part of the costs. A court's award will be reversed if the decision is clearly erroneous as to the factual basis for the award or if the court has abused its discretion. *Shepard v. City of St. Paul*, 380 N.W.2d 140, 143 (Minn.Ct. App.1985).

At the hearing on the motion for attorneys' fees, HKM's counsel agreed not to challenge the reasonableness of the rates charged by Anderson's attorneys, and the trial court found these rates to be reasonable. The court also found that all the hours billed by Anderson's attorneys were reasonably expended in the prosecution of the lawsuit. HKM argues, however, that the trial court failed to exclude excessive and redundant charges, as well as charges spent on unsuccessful claims. *See id.* HKM points out that three attorneys were always present at trial and that Anderson was unsuccessful in her claim of intentional infliction of emotional distress.

Nevertheless, Anderson prevailed on her claim against HKM. The court recognized the excellent work performed by Anderson's attorneys and the good results they achieved. "Where a plaintiff [obtains] excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The court found the time billed was reasonably necessary for the successful prosecution of the action and that the amount charged by Anderson's attorneys was fair and reasonable to compensate them for their work. While we may have arrived at a different conclusion, we cannot say that the court was clearly erroneous as to the factual basis for the award or that it abused its discretion.

█ In a related context, Anderson asks that, if she prevails before this court, she be allowed to apply for her costs and attorneys' fees for this appeal. As we noted earlier, Minn.Stat. § 363.14, subd. 3 provides for the award of attorney's fees as part of the costs. In *Hughes v. Sinclair Marketing, Inc.*, this court held:

> It would be inconsistent with the intent of the legislature, in providing for attorneys' fees, to dilute a fee award by refusing to compensate an attorney for the time reasonably spent on appellate work defending a judgment.

375 N.W.2d 875, 879 (Minn.Ct.App.1985), *aff'd in part, rev'd in part*, 389 N.W.2d 194, 200 (Minn.1986).

### DECISION

The trial court is affirmed in all respects. Because Anderson has prevailed in her appeal, she may, pursuant to Minnesota Rule of Civil Appellate Procedure 127, file a petition (with four copies and proof of service) with this court within ten days requesting additional attorneys' fees. She shall support her request with such specific documentation as will enable this court to make a decision on those fees. HKM, if it so desires, may file written objections (with four copies and proof of service) within five days of receipt of the petition.

Affirmed.

FOLEY and RANDALL, JJ., concurs in part, dissents in part.

FOLEY, Judge (concurring in part, dissenting in part).

I fully concur in sustaining the damages awarded Anderson, including attorney's fees, because of the shabby treatment she received from her employers, but I would go further.

Anderson should have received damages through the time of trial. The trial court terminated damages in 1983 on the theory that plaintiff could have obtained employment by early 1983. The record discloses that Anderson testified that she has at all times sought comparable employment. She immediately prepared her resume and obtained letters of recommendation which she sent to numerous companies. She read and answered want ads, registered with an employment agency, and finally advertised to and did perform freelance secretarial work.

There is no evidence in the record to establish that Anderson was offered a comparable position through the time of trial. The trial court should be reversed in its holding limiting damages through 1983 as not sustained by the evidence. Witnesses for HKM "speculated" that Anderson *could* have obtained employment. It is a basic rule of the law of damages that an award may not be based upon speculation or conjecture. The same standard ought to apply if it claimed that Anderson could have mitigated damages.

The case at hand is one where an employee was wrongfully discharged. The rule is:

When a wrongfully discharged employee fails to exert a reasonable effort to pursue or unreasonably declines to accept other employment, the rule of avoidable consequences may prevent him from recovering the full amount of the salary promised under the contract. Recognizing that, peculiar to employment contracts, the working hours of a wrongfully discharged employee are at his sole disposal, 1 Restatement, Contracts, § 336(1), sets forth the following rule:

"Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation."

Ordinarily, a wrongfully discharged employee can readily foresee that, if he unreasonably declines to pursue or accept similar employment in the same locality, his damages will continue to increase. The restatement rule thus recognizes that in situations where a wrongfully discharged employee does nothing to avert unnecessary loss the increased damage is more properly charged to the employee than the employer. *The burden of proof rests on the employer to establish that reasonable steps were not taken by the employee to mitigate foreseeable damages.* The employer must also establish that, had other available employment been accepted, the employee could have avoided his damages in whole or in part without "undue risk [or] expense" or without suffering "humiliation" in the sense of being embarrassed, chagrined, or degraded. See, also, *Cooper v. Stronge & Warner Co.*, 111 Minn. 177, 126 N.W. 541 (1910); *Bennett v. Morton*, 46 Minn. 113, 48 N.W. 678 (1891).

*Soules v. Independent School District No. 518*, 258 N.W.2d 103, 106–07 (Minn.1977) (emphasis supplied).

In my judgment, based upon the foregoing authorities, the employer did not meet its burden of proof, the finding is not sustained by the evidence and the case should be remanded to award Anderson damages through the time of trial.

RANDALL, Judge, concurring in part and dissenting in part.

I concur with the majority that the record supports the trial court finding of discrimination against respondent when she was discharged. However, I would remand for the court to clarify its February 6, 1986, order for back-pay damages in light of *Bibbs v. Block*, 778 F.2d 1318 (8th Cir. 1985).

Here the court found,

The pregnancy of the [appellant] was a discernible, discriminatory, and causative

factor of the [appellant's] denial of maternity leave to the [respondent] * * *. But the court also found:

> The [appellant] produced some evidence of a legitimate nondiscriminatory reason for the [appellant's] denial of maternity leave and her discharge, to wit: dissatisfaction with the job performance of the [respondent].

Under *Bibbs*, where an employer has both a legitimate motive and a discriminatory motive for terminating an employee,

> the plaintiff is entitled to some relief * *. However, even after a finding of unlawful discrimination is made, the defendant may avoid an award of * * * back pay if it can prove by a preponderance of the evidence that the plaintiff would not have been hired or promoted even in the absence of proven discrimination.

*Id.* at 1324. This case requires a remand because the court did not reach this step of analysis.

If the court finds appellant was motivated, in part, by a discriminatory purpose, the decision to terminate is not automatically unlawful. Rather, that finding shifts to appellant the burden of establishing that respondent would have been discharged even if the impermissible purpose had not been considered. *Bibbs*, 778 F.2d at 1322–23.

> A defendant's showing that the plaintiff would not have gotten the job anyway does not extinguish liability. It simply precludes the remedy of * * * reinstatement.

*Id.* at 1323. It also precludes the remedy of back pay. *Id.* at 1324.

The record supports the trial court's finding that part of appellant's reason for terminating respondent was legitimate. Appellant's officers discussed, on more than one occasion, their dissatisfaction with respondent's job performance. They had notified respondent of their dissatisfaction. The fact that they once privately discussed terminating respondent does not prove their motives were discriminatory. Appellant's officers stated the reason for discussing respondent's termination off the record in the Steamboat Springs board meeting was to spare respondent embarrassment. That does not prove a conspiracy of silence. While the minutes of this meeting were silent on respondent's termination, I find it speculative to conclude that appellant's motives could only be wrongful. The record does not support that appellant was motivated only by intent to discriminate against respondent.

Under *Bibbs*, a remand is appropriate to determine whether the legitimate motive for discharging respondent, even though contemporaneous with her pregnancy, would have led to respondent's discharge despite her pregnancy. Should the court find appellant's reasons were legitimate, and that those reasons justified termination even though the impermissible motive is also present, there would have to have been, under *Bibbs*, a redetermination of damages, as much of respondent's damages are back pay.