LaVonne ANDERSON, Respondent,

v.

HUNTER, KEITH, MARSHALL & CO., INC., Petitioner, Appellant.

Nos. C1–86–1039, C8–86–1619.

Supreme Court of Minnesota.

Jan. 8, 1988.

Frederick E. Finch, Robert C. Boisvert, Jr., Minneapolis, for appellant.

J. Dennis O'Brien, Dayle Nolan, William R. Skallerud, Minneapolis, for respondent.

## OPINION

KELLEY, Justice.

In bringing this action claiming a wrongful discharge against her former employer

Hunter, Keith, Marshall & Co., Inc. (HKM), LaVonne Anderson (Anderson) alleges that the termination of her employment with the company was the result of its discrimination against her on the basis of her sex, marital status, and pregnancy in violation of the Minnesota Human Rights Act (Minn. Stat. § 363.03, subd. 1(2)(b), (2)(c), (5) (1986)). The trial court found unlawful discrimination, awarded damages, awarded Anderson her attorney fees, and enjoined HKM from discriminating against employees because of pregnancy. The court of appeals affirmed. *Anderson v. Hunter, Keith, Marshall & Co.*, 401 N.W.2d 75 (Minn.App.1987). We affirm the rulings of unlawful discrimination, damages and the injunction. We reverse the attorney fees award.

HKM is a small investment banking corporation established in 1975. The principal officers active in the business were Hunter and Keith. In 1978 the firm hired LaVonne Anderson as a secretary. Prior to her employment with HKM she had approximately six years secretarial experience as a legal secretary in a large Minneapolis law firm. During her employment interview with HKM, in response to questions, Anderson indicated that she was married but that she and her husband had no immediate plans to have children. Anderson served as secretary to both Hunter and Keith, doing stenographic work, making their personal and business travel arrangements, filing, performing receptionist duties, invoicing, ordering supplies, handling claims and checking accounts, and performing other general services of a similar nature. In both 1979 and 1980, following year-end performance reviews, she received a 10 percent salary increase as well as a $1,000 bonus, although in 1980 her employers commenced to voice some dissatisfaction with her failure to organize a satisfactory filing system.

From 1978 to 1981 the firm quadrupled the number of its business transactions. It hired another investment banker during that time. Anderson also served as his secretary. A bookkeeper who had been hired in 1979, by the end of 1981 was assuming some of Anderson's "minor" duties.

During Anderson's 1981 performance review, additional complaints concerning her work were beginning to surface. Her employers expressed criticism of her failure to develop a satisfactory filing system, and complained about a noted change in her attitude, about her typing, invoicing, and inefficient handling of travel arrangements. Despite these expressed manifestations of dissatisfaction with her work performance, and notwithstanding one of her employers then wished to fire her, Anderson was nonetheless awarded a 10 percent salary increase and a $1,000 bonus in that year also. The two principal corporate officers active in the business, Hunter and Keith, at trial maintained she was retained and given the bonus and raise in order to keep her from becoming more hostile in attitude, and also to help her at a time of personal financial difficulty attributable to her husband's then unemployment.

Because she was not satisfied with the 1981 year end bonus and salary increase, early in January 1982 Anderson again sought an interview and met with Hunter and Keith. At that meeting she presented to them a job description which she had prepared, and requested increased remuneration. Hunter and Keith rejected the request, they claim, because they felt it was unmerited in the light of the shortcomings they perceived in her job performance and which they had discussed with her shortly before. After this request was denied, her employers asserted that Anderson seemed to lose all interest in her job. To some extent, at least, that conclusion was corroborated by another office employee at the trial. Also, the record contains evidence that on occasion Anderson had delayed in billing invoices, creating potential problems with the Securities and Exchange Commission which could cost the firm money. Shortly after the January meeting, management had learned that respondent was converting to her own use Northwest Orient Airlines "Frequent Flyer" flight coupons earned by HKM. Even though Anderson was told that only the directors

could assign those coupons, she ignored the admonition and assigned some of HKM's flight coupons to her relatives.

At the trial HKM claimed that it had held a corporate board of directors meeting early in February 1982 at Steamboat Springs, Colorado. They claim that at this meeting Anderson's deteriorating work performance was discussed, and that a decision was reached to fire her. No reference to that decision appears in corporate minutes, and, in any event, she was not then terminated.

Approximately a month later Anderson informed Keith that she was pregnant, that she intended to take a two or three-month leave of absence, and that thereafter she intended to return to work. HKM had no written policy governing leaves of absence. Keith informed Anderson it would be inconvenient to have her gone from the office for such an extended period, and repeated that or similar comments to another office employee.

From then on, until Anderson's employment was finally terminated, the parties have divergent recollections of events. HKM claims, as indicated, that prior to Anderson's announcement the decision had been made at the Steamboat Springs meeting to replace Anderson. After learning of her pregnancy, Keith and Hunter contend they determined not to immediately fire her, but rather to let her remain until the date she proposed to start her maternity leave, at which time she would be terminated, thus allowing her to "save face" by leaving the impression that the termination had been voluntary on her part in order to be with her family. Neither Hunter nor Keith informed Anderson of this decision because they felt that to do so would increase her hostility to an even more unbearable level. They likewise claim that to spare her feelings, a story was devised that Anderson wanted to permanently resign upon commencement of her maternity leave in order to be with her family. Pur-

suant to this scheme, replacement applicants were told Anderson would not be returning and that employment would be permanent. Finally, in mid-June Anderson was told she was being fired because her work performance had not improved since her last evaluation.

Anderson claims that when she informed Keith of her pregnancy, she was told to find a temporary replacement to work during her leave. Notwithstanding, she claims that at least one applicant, who was ultimately hired as a permanent replacement, was secretly interviewed away from the business premises in order to conceal from Anderson that a permanent replacement was being sought instead of a temporary one. Ultimately she left the employment at the end of July. Her successor began immediately. The replacement testified that when she commenced work the office was "in chaos."

These conflicting stories give rise to the opposing contentions of the parties. Anderson claims, of course, that her firing was the direct result of discrimination based on pregnancy status. HKM contends that her performance had so deteriorated by February 1982 that a decision had been made to terminate Anderson before it was known by any of its officers that she was pregnant, but after learning of that fact, in order to spare her feelings, the employment was extended to the time she left to have the baby so that she would not be saddled with the stigma of having been fired.

The trial court, sitting without a jury, found that HKM had mixed motives for firing Anderson, motives generated by permissible as well as impermissible reasons.[1]

Nevertheless, the trial court concluded that appellant's action of discrimination against Anderson violated Minn.Stat. § 363.03, subd. 1(2)(b), 2(c), (5) (1986),[2] and

---

1. In Finding 14 the trial court found the pregnancy was a "discernible, discriminatory, and causative factor * * * of the Defendant's discharge of Plaintiff." In Finding 16 the trial court found "some evidence of a legitimate nondiscriminatory reason for the Defendant's * * *

discharge, to wit: dissatisfaction with the job performance of the Plaintiff."

2. Minnesota Human Rights Act, § 363.03 (1986) Unfair Discriminatory Practices:

awarded her damages together with other relief.[3]

On review the Court of Appeals affirmed trial court rulings on both damages and attorney fees, and held that Anderson might petition the court within 10 days for additional attorney fees incurred on the appeal.[4]

■ (1.) The issue we first address arises from the trial court's determination that Anderson's pregnancy was a "discernible, discriminatory, and causative factor * * * of the discharge of the Plaintiff." The trial court applied a test originally suggested in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas*), as an aid to analysis in discrimination cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (1981) (Title VII). As the result of the substantial similarities existing between Title VII and Minnesota's Human Rights Act, we have frequently applied principles which have evolved in the adjucation of claims under the federal act, and, specifically we have adopted the *McDonnell Douglas* analysis as an aid to resolving cases claiming disparate treatment. *See, e.g., Danz v. Jones*, 263 N.W.2d 395, 399 (Minn. 1978), *Hubbard v. United Press Int'l Inc.*, 330 N.W.2d 428, 441 (Minn. 1983); *Kaster v. Indep. School Dist. No. 625*, 284 N.W.2d 362, 364 (Minn.1979); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719 (Minn. 1986). This procedure contemplates a three-part analysis for adjudicating disparate treatment claims. The analysis commences by initially placing upon any person claiming disparate treatment the onus of establishing a prima facie case of disparate treatment based upon a statutorily prohibited discriminatory factor. If a prima facie case is established, a presumption then arises that the defendant (usually, but not always, an employer) unlawfully discriminated against the claimant. The burden of producing evidence then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's treatment. If the defendant can produce sufficient evidence to raise a genuine issue of fact that its stated motive for treating the claimant as it did arose from legitimate nondiscriminatory reasons, the burden shifts to the claimant to demonstrate that the defendant's asserted legit-

---

Subdivision 1. **Employment.** Except when based on a bona fide occupational qualification, it is an unfair employment practice:

\* \* \* \* \* \*

(2) For an employer, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local commission, disability, or age,

\* \* \* \* \* \*

(b) to discharge an employee; or

(c) to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

\* \* \* \* \* \*

(5) For an employer, an employment agency or a labor organization, with respect to all employment related purposes, including receipt of benefits under fringe benefit programs, not to treat women affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth, the same as other persons who are not so affected but who are similar in their ability or inability to work.

\* \* \* \* \* \*

3. The trial court awarded Anderson $60,000 compensatory damages for back pay and lost benefits for the period August 1982 through 1983 and for mental anguish or suffering, plus costs, disbursements and attorney fees. Originally a civil penalty was imposed of $5,000 payable to the State of Minnesota. In a separate and later proceeding, the court awarded Anderson $59,866.25 as reasonable attorney fees.

Post-trial motions of both parties in most respects were denied, except that the trial court amended its conclusions of law to strike the $5,000 civil penalty and substitute an injunction against HKM prohibiting future discrimination on the basis of pregnancy. Further, the trial court ordered Anderson to return any frequent flyer coupons still in her possession.

4. The panel of the court of appeals did have some disagreement on the amount of damages. Judge Foley would have awarded compensatory damages through the time of trial. Judge Randall would have remanded the case to the trial court for application of the "same decision" test enunciated in *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) for determination whether HKM would have discharged Anderson without regard to any discrimination, and if the trial court subsequently so determined, there would have been, under *Bibbs*, a redetermination of damages related to back pay. *See, e.g.*, 401 N.W.2d at 84–85.

imate reasons were pretextual. *See, e.g., Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).

Minnesota's Human Rights Act prohibits disparate treatment of pregnant women. Minn.Stat. § 363.03, subd. 1(5) (1986). Gender discrimination is likewise prohibited. Minn.Stat. § 363.03, subd. 1(2)(b) and (c). When a substantial causative factor entering into the decision to discharge an employee is based upon gender or a status of pregnancy, the Minnesota Human Rights Act (Minn.Stat. § 363.03, subd. 1, 2(b), (5) (1986)), affords the employee remedies against the employer including an action for the recovery of damages, injunctive relief, and costs and attorney fees. *See* Minn.Stat. § 363.071, subd. 2 (1986).

Appellant HKM argues that the *McDonnell Douglas* analysis applied by the courts below is to be employed only in so-called "single-motive" cases. This conclusion follows, it claims, from the fact that all of our prior cases where the *McDonnell Douglas* analysis was utilized were "single-motive" cases. However, it argues, that in this case, because it involves "mixed-motives" or dual motives, the trial court erred in refusing to apply a different and what it claims to be a more appropriate analysis. It asserts that in cases arising under Title VII, federal appellate courts have distinguished a "single-motive" case from a "mixed-motive" case, and, after doing so, have employed an analysis differing from that found in *McDonnell Douglas. See, e.g., Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985); *Haskins v. United States Dep't of Army,* 808 F.2d 1192 (6th Cir.) *cert. denied,* —— U.S. ——, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987). In fact, appellant avers that none of the United States Circuit Courts of Appeal which have considered the issue under Title VII use the *McDon-*

*nell Douglas* analysis in a "mixed-motive" case.[5]

Noting that Minnesota appellate courts generally adopt the interpretation federal courts give to Title VII when interpreting Minnesota's Human Rights Act (Minn.Stat. ch. 363 (1986)), appellant contends we should likewise employ the federal analysis employed by various U.S. Courts of Appeal in resolving a so-called "mixed-motive" case arising under our Human Rights Act.

■ We acknowledge that appellant correctly observes that in the past we have generally applied to our Human Rights Act the interpretation federal courts have applied to cases arising under Title VII. However, notwithstanding that past practice, we are unpersuaded that there exists any compelling reason at this time for us to depart from the analysis so recently adopted and reaffirmed in *Sigurdson v. Isanti County,* 386 N.W.2d 715, 719–20 (Minn. 1986). Our examination of decisions recently emanating from the various federal courts of appeal, which seemingly have deviated in some respects from the original *McDonnell Douglas* analysis in "mixed motive" cases under Title VII, fails to convince us that the *McDonnell Douglas* analysis may not appropriately be applied in the analysis of all disparate treatment claims, whether denominated "single-motive" or "mixed-motive."

In a "single-motive" case the claimant asserts the existence of an unlawful reason for the treatment received; the defendant advances a lawful reason; and the court decides which is true. The analysis applied by some federal courts in mixed-motive cases differs in that the court initially finds that both the unlawful and the lawful reasons have been proved, after which it proceeds to determine whether the "same decision," that is, as in this case, discharge, would have been made even had there been complete absence of the unlawful discrimi-

**5.** *See, e.g., Fields v. Clark University,* 817 F.2d 931 (1st Cir.1987); *Smallwood v. United Air Lines, Inc.,* 728 F.2d 614 (4th Cir.1984), *cert. denied,* 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703 (6th Cir.1985); *Caviale v. State of Wis. Dep't of Health and Social Services,* 744 F.2d 1289 (7th Cir.1984); *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985) (en banc); *Marotta v. Usery,* 629 F.2d 615 (9th Cir.1980); *Harbison v. Goldschmidt,* 693 F.2d 115 (10th Cir.1982); *Miles v. M.N.C. Corp.,* 750 F.2d 867 (11th Cir.1985); *Day v. Mathews,* 530 F.2d 1083 (D.C.Cir.1976) (per curiam).

natory reason. *See, e.g., Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985); Brodin, *The Standard of Causation in the Mixed–Motive Title VII Action: A Social Policy Perspective,* 82 Colum.L.Rev. 292 (1982).

Even federal courts who purport to apply the "same decision" analysis are not in complete agreement as to the focus of the test applied. The Eighth Circuit Court of Appeals set forth the analysis it deemed appropriate for use in a "mixed motive" case in *Bibbs v. Block:*

> [O]nce the plaintiff has established a violation of Title VII by proving that an unlawful motive played some part in the employment decision or decisional process, the plaintiff is entitled to some relief, including, as appropriate, a declaratory judgment, partial attorney's fees, and injunctive relief against future or continued discrimination. However, even after a finding of unlawful discrimination is made, the defendant is allowed a further defense in order to limit the relief. The defendant may avoid an award of reinstatement or promotion and back pay if it can prove by a preponderance of the evidence that the plaintiff would not have been hired or promoted even in the absence of the proven discrimination.

778 F.2d at 1323–24 (footnote omitted). Courts employing that analysis focus on the remedy more than upon the causation factor. Under it, once a claimant has established an unlawful motive played some part in the employment decision, liability under Title VII is established, and plaintiff is entitled to some specific relief by way of partial attorney fees, costs, and injunction. The employer, however, can avoid an award of reinstatement, back pay and oth-er consequential damages if it can prove that the "same decision" would have been made absent the unlawful reason. By denying a victim, who admittedly has received disparate treatment based upon unlawful discrimination, from the full panoply of civil remedies granted in the statute, less incentive exists for victims to prosecute discrimination claims to the end that the public policy of erradicating discrimination, as embodied by the Human Rights Act, may well be frustrated. For that reason, and also in view of the shaky foundation of *Bibbs,*[6] we concur in the rejection of the *Bibbs v. Block* analysis in so-called "mixed-motive" cases.

The other version of the "same decision" analysis is typified by *Haskins v. United States Dep't of Army,* 808 F.2d 1192, 1197–98 (6th Cir.) *cert. denied,* —— U.S. ——, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987):

> [W]hen it is alleged that * * * there was more than one reason for the adverse employment action—we held that the causation standard, or 'same decision' test, of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) applied. *Blalock,* 775 F.2d at 712. Under the *Mt. Healthy* test, once a plaintiff has met his or her burden of showing that the illegal conduct more likely than not was a motivating factor in the employment decision, the defendant must be given the opportunity to show, by a preponderance of the evidence, that the same decision would have been reached even in the absence of discrimination. *See id.* at 710–12. * * * If the [defendant] meets the burden of production,

---

**6.** Originally rendered by a panel of the court, it was reheard *en banc* pursuant to a petition for rehearing. Judge Arnold wrote the opinion in which Chief Judge Lay and Judges Heaney and McMillian concurred separately in the result but objected to the application of a "same decision" test to mixed motive cases in a Title VII context, *Bibbs,* 778 F.2d at 1325. Judge Lay stated that the "same decision" test "does not establish a new test, but simply restates the test in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), in a different way." *Id.* at 1325–26.

Judge Bright wrote a separate concurrence arguing for a "causal relationship" test. *Id.* at 1328–29. Judge McMillian also wrote a separate concurrence disagreeing with the preponderance of the evidence standard in the "same decision" test and advocating a standard of clear and convincing evidence. *Id.* at 1329–30. Judges Ross, Fagg and Bowman dissented arguing for a "motivating factor" test. *Id.* at 1330–32. Thus *Bibbs* provides no clear guidance of a "same decision" test for application in mixed-motive individual disparate treatment cases.

there is no Title VII liability.[7]

If we decline to follow *Bibbs*, as we do, appellant HKM urges us to apply the *Mt. Healthy* analysis in "mixed-motive" cases. That inquiry differs from the *Bibbs* analysis in that *Bibbs* focuses primarily on the remedial stage of the *McDonnell Douglas* analysis, whereas the *Mt. Healthy* analysis primarily affects the liability stage. Thus, under the *Mt. Healthy* analysis, if the employer can meet the burden of proving the discharge would have occurred in the absence of discrimination, claimant would have no recovery—not even injunctive relief, costs, or attorney fees. We agree with respondent Anderson that not only is the *Mt. Healthy* test at odds with our cases holding the *McDonnell Douglas* analysis is the appropriate one for application in disparity treatment cases alleging illegal discrimination, but also that its adoption for use in disparate treatment cases would defeat the broad remedial purposes of the Minnesota Human Rights Act by permitting employers, definitionally guilty of prohibited employment discrimination, to avoid all liability for the discrimination provided they can prove that other legitimate reasons may coincidentally exist that could have justified the discharge. *See generally* Brodin, *The Standard of Causation in the Mixed–Motive Title VII Action: A Social Policy Perspective*, 82 Colum.L.Rev. at 316–23 (1982). We are certain that result could not have been within the contemplation of the legislature when it enacted the Minnesota Human Rights Act. Therefore, we likewise decline appellant's invitation to adopt the *Mt. Healthy* analysis in disparate treatment cases arising under Minn.Stat. ch. 363 (1986).

Finally, under either of the *Bibbs* or *Mt. Healthy* "same decision" analysis, the plaintiff must rebut the employer's claim that the discharge decision would have been the same absent the prohibited discrimination—not an easy task. Placing this burden upon the plaintiff increases the probability that a victim of admitted discrimination may be denied compensation unless the victim has literally proved that discrimination was the sole cause of the discharge.

On the other hand, the public policy underlying and embodied in the Human Rights Act, even in so called "mixed-motive" cases, can be, and is, well served by continued adherence to the principles of analysis set forth in *McDonnell Douglas* and our line of cases applying it to disparate treatment claims arising under the act. As summarized by the court of appeals below:

> To some extent, every claim of disparate treatment raises questions of mixed motives. Rarely will an employer fail to offer a legitimate business reason for its actions. Once a legitimate reason has been offered, the employee has the final burden of demonstrating that the proffered reason was not the true reason for employer's actions. The trial court's task is to determine whether the employee has met this burden. The court's characterization of the employer's motives is immaterial at the third stage of the analysis. The question is solely whether or not the court is persuaded that the employee has been the victim of intentional discrimination.

*Anderson v. Hunter, Keith, Marshall & Co.*, 401 N.W.2d 75, 81 (Minn.App.1987). Because the *McDonnell Douglas* analysis, employed by this court in the past and by the trial court in this case, better effectuates the underlying policy of the Human Rights Act to protect victims of discrimination while simultaneously affording the alleged perpetrator the opportunity to articulate legitimate undiscriminatory reasons for the employment actions taken, we affirm the courts below in rejecting an ostensibly different analysis in a so-denominated "mixed-motive" case. Courts of this state should continue to apply the *McDonnell Douglas* analysis in employment cases involving claims of disparate treatment brought under the Minnesota Human Rights Act regardless of whether a claim

---

**7.** Because this "mixed-motive" test has its genesis in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (a case arising under 42 U.S.C. 1983), it is generally referred to as the *Mt. Healthy* test.

has the label of being a "single-motive" or "mixed-motive" case.

▮▮▮ Next, HKM argues that even if use of the *McDonnell Douglas* analysis was appropriate in this "mixed-motive" case, the trial court improperly failed, in making its findings, to explicitly apply the three-step analysis. Appellant complains, in particular, that the court failed to specifically find the reason advanced by HKM was "pretextural" or that the "discriminatory reason" more likely than not motivated HKM in its discharge decision. It relies on our holding in *Sigurdson v. Isanti County*, 386 N.W.2d 715, 721 (Minn.1986) where, after explaining the reason for requiring explicit findings is to primarily facilitate review by an appellate court, we did mandate that in these disparate treatment cases arising under the Human Rights Act, the trial court must explicitly apply the *McDonnell Douglas* three-step analysis. However, in this case, we reject HKM's contention for three reasons. First of all, the trial court did not have the benefit of our holding in *Sigurdson*, as that case was decided and published more than three months after the trial court made its findings. Secondly, although we clearly indicated in *Sigurdson* that trial courts, in making findings in disparate treatment cases under the *McDonnell Douglas* analysis, must make findings of fact explicitly applying the three-step analysis, a ruling to which we still adhere, we clearly stated the purpose of the requirement was to facilitate appellate review. *Id.* at 722. However, in the same case, we acknowledged that the holding "does not require the trial court to rigidly and mechanically apply a *McDonnell Douglas* type analysis." *Id.* at 721; *see also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978). Finally, examination of the trial court's findings indicate that the trial court appreciated the requirements placed on each party by the three-part analysis of *McDonnell Douglas*, and was justified in holding that Anderson has sustained her ultimate burden, and had established that she had been discharged and discriminated against, and that her pregnancy had been a "discernible, discrim-inating, and causative factor" in her discharge. While we agree with the appellant that it would have been preferable—and since *Sigurdson*, mandatory—that the court should have made a specific finding on the third step of *McDonnell Douglas* analysis, yet in view of the findings as a whole, it clearly appears here that the trial court was cognizant of the requirements of the three-step analysis and properly applied them to the evidence. The discrimination finding is supported by the weight of the evidence, and certainly cannot be said to be clearly erroneous. Therefore, we will not set it aside. *See Strouth v. Wilkison*, 302 Minn. 297, 299, 224 N.W.2d 511, 513–14 (1974).

(2.) The trial court found that Anderson had attempted to mitigate her damages by seeking suitable alternative employment from October 1982 (after the birth of her twins) through the end of 1983. Based on that finding the trial court awarded damages through 1983. This finding was affirmed by the court of appeals. Appellant HKM here argues that Anderson could have found comparable work by the end of 1982 and consequently is not entitled to any damages for the calendar year 1983.

▮▮▮ The civil damage remedy afforded a discrimination victim under the Minnesota Human Rights Act contemplates compensating the victim to restore her, as near as possible, to the same position she would have attained had there been no discrimination. *See, e.g., Bhd. of Ry. and S.S. Clerks, Freight Handlers, Express and Station Employees, Lodge 364 v. State of Minnesota*, 303 Minn. 178, 195, 229 N.W.2d 3, 13 (1975). Victims of discrimination, however, do have the duty to minimize damages by using "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (under Title VII). Generally, a claimant forfeits his or her right to recover back pay from the employer from the time he or she declines a job substantially equivalent to the one lost. *Id.* at 231–32, 102 S.Ct. at 3065–66.

Anderson's deposition testimony and her trial testimony were contradictory, both as to the extent of her job search and whether she had declined employment providing equivalent conditions of employment to that she had enjoyed at HKM. Although prior to her employment by HKM, she had six years of experience as a legal secretary, she initially claims she had not sought a law related position. At trial, however, she claimed she had. The trial court was also presented with conflicting evidence on whether equivalent employment was available, and when it was available. The resolution of these claims was for the trial court. Without doubt, the trial court's conclusion that Anderson could have been placed in equivalent employment no later than by 1983 year end, had she desired, is supported by more than sufficient evidence. The trial court's conclusion that she could not have so been placed by the end of 1982 is likewise so supported. Appellate courts will reverse a trial court finding of this nature only if it is clearly erroneous and without support in the evidence. Our examination in this record convinces us that the trial court's order is neither.

(3.) Finally, appellant HKM raises a more troubling issue by its challenge to the trial court's award of almost $60,000 as attorney fees to be paid by HKM to Anderson's attorneys. The amount of the award is only a few hundred dollars less than plaintiff's ultimate recovery. Appellant HKM claims that in arriving at that figure the trial court failed to identify and exclude excessive, redundant, and unnecessary charges from the fee request of Anderson's attorneys. In arriving at the "reasonable fee" awarded, the trial court,

with one exception, accepted at face value the number of hours plaintiff's attorneys claimed to have been put into the case and multiplied those hours by an hourly charge.[8] The result so obtained was the fee awarded, which even the trial court observed "at first blush, might seem disproportionate."

Because Minn.Stat. § 363.14, subd. 3 (1986), allowing a successful plaintiff in a discrimination case such as this to recover attorney fees is "virtually identical" to similar provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b), in reviewing attorney fees awards, we have followed federal law. *See, e.g., Sigurdson v. Isanti County*, 386 N.W.2d 715, 722 (Minn.1986). The seminal case addressing the analysis to be employed in awarding attorney fees under federal statutes is *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[9]

The trial court commenced its analysis of the claimed attorney fees in conformance with the procedure set forth in *Hensley v. Eckerhart*. The first step of that analysis involves a determination of the so-called "lodestar" figure. This figure is determined by multiplying the "number of hours reasonably expended on the litigation * * * by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. at 1939. Although the initial step in the *Hensley* analysis requires the court to determine the number of hours "reasonably expended" on the litigation, our review of the trial court's findings of fact and attached memorandum leaves us with the clear impression that in its analysis the trial court merely accepted at face value the "hours expended" representation of

---

8. The plaintiff's fee claim was predicated on an hourly charge of $40 per hour for law clerks, $75 an hour for associates, and $100 an hour for directors. At the hearing on the attorney fee motion, appellant HKM agreed not to challenge the reasonableness of those rates.

The trial court disallowed the claimed charge of $1,837.50 which it found had arisen from the representation by the attorneys of the plaintiff in an unrelated matter. It likewise rejected plaintiff's request to "enhance" the attorney fee award.

9. The issue generating the attorney fees analysis in *Hensley* arose in an action under 42 U.S.C. § 1988. However, since that decision federal courts have applied the *Hensley v. Eckerhart* attorney fee analysis in the context of other statutes permitting the recovery of fees by the prevailing party including Title VII cases. We, likewise, have adopted that analysis in examining claims of successful litigants in actions brought under the act regulating security transactions in Minnesota. (Minn.Stat. § 80A.23 (1986)). *See, e.g., Specialized Tours, Inc., v. Hagen*, 392 N.W.2d 520, 540–42 (Minn.1986).

Anderson's attorneys, without further analysis as to the reasonableness of the submission, and then after doing so, multiplied those hours by a rate deemed to be reasonable to arrive at the ultimate award. One might assume that by accepting the attorney's claimed "hours expended" figure at face value without further analysis or comment that the trial court implicitly found those claimed hours to be "reasonable." However, nothing in the findings, nor anything in the court's memorandum attached to them, exists to support any conclusion that the trial court had specifically scrutinized the "hours expended" claim to determine the reasonableness of that item, notwithstanding that throughout the history of this matter appellant's contention has been, and still is, not that the hourly rates claimed by Anderson's attorneys were unreasonable, but rather that the number and type of hours expended were "excessive, redundant and unnecessary." The *Hensley* analysis requires that the trial court exclude from the initial "lodestar" calculation hours that were not "reasonably expended." *Id.* at 434, 103 S.Ct. at 1939. *See also Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 542 (Minn. 1986); *Shephard v. City of St. Paul,* 380 N.W.2d 140, 143 (Minn.App.1985).[10]

 Although the legal question posed by this case was novel to Minnesota law, the factual presentation of the case appears to have posed no novel, unusual, or difficult problems of proof. The trial did not involve matters of procedure significantly different from those existing in similar types of employee-employer discharge cases not involving statutory discrimination claims. This lawsuit, involving only two parties, was one in which the ultimate conclusion basically hinged on the credibility of Anderson, Keith, and Hunter. There-

fore, when the reasonableness of Anderson's attorneys' asserted fees was being challenged as they were here, it seems to us, for example, that the trial court in its order approving a fee based upon a "lodestar" figure, should have articulated why it found it reasonable that Anderson's attorney charged the time of at least three lawyers in each day of a five day trial resulting in claimed fees which appellant claims is in excess of $12,000, when only one attorney at trial questioned witnesses and argued the case. While we appreciate that a good way to train associates in trial practice is to have them "sit in" on trials and aid lead counsel, it does not follow necessarily that their time is "reasonably expended" in behalf of the client, and if not, properly billed to one's adversary. *See Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980). In addition to that example, the fee claim lists other "hours reasonably expended" that, in the absence of trial court findings, appear to be questionable. In this category, are time claims for drafting pleadings totaling approximately 27 hours: time claims for preparing and presenting unsuccessful motions; time expended on "file review," "preparation for trial," etc. *See, i.e., Chrapliwy v. Uniroyal, Inc.,* 583 F.Supp. 40, 47 (N.D.Ind.1983). However, from our vantage point we cannot determine the reasonableness of those "time reasonably expended" claims. From its vantage point, the trial court, being completely familiar with all aspects of the action from its inception through post trial motions, is in a much better position to make those evaluations. But when the reasonableness of the charges are challenged, as here, the trial court must not only make a decision on the claim but provide a "concise but clear explanation of its reasons for the fee award."

---

**10.** In *Hensley v. Eckerhart,* the Supreme Court of the United States observed:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the pri-

vate sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.' *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

*Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. We do not hold that the fee allowed by the trial court was unreasonable: we merely hold that when the reasonableness of the "hours expended" component of the fee claim is challenged, the trial court should scrutinize it, and either make findings or otherwise concisely explain why it felt the hours claimed are reasonable or unreasonable.

Finally, appellant asserts that Anderson originally advanced claims on which she was ultimately unsuccessful, and that she should not be awarded attorney fees incurred on those claims on which she did not succeed. Her asserted claims for intentional infliction of emotional distress, punitive damages, treble damages, damages through the date of trial, and her defense on appellant's counterclaim were all unsuccessful. Under *Hensley* the "results obtained" factor is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of the claims for relief." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1941; *see also Specialized Tours, Inc. v. Hagen,* 392 N.W.2d at 542 (Minn.1986). Though the trial court in its memorandum noted that it "has been most cognizant of the excellent work done by the Plaintiff's attorneys and good results achieved," it is not clear from either the findings or the memorandum that in making its fee award the trial court took into consideration any claimed fees incurred on unsuccessful claims. *See Hensley,* 461 U.S. 434–35, 103 S.Ct. at 1939–40.

We do not remand because we conclude the trial court's fee award was unreasonable. The fee allowed by the court may be reasonable and justified by the circumstances, but in the absence of findings, or their equivalent, employing the *Hensley v. Eckerhart* analysis as adopted by this court in *Specialized Tours, Inc. v. Hagen,* we are unable to say that the trial court's findings were not clearly erroneous. When, as here, the losing party raises serious questions as to the reasonableness of the requested fee or the time and rate components of the "loadstar" figure, in making an award trial courts should ad-dress the issues raised and give reasons accepting or rejecting the request.

Affirmed in part, reversed in part and remanded for further proceedings.

POPOVICH, J., took no part in the consideration or decision of this case.