**Anibal SANCHEZ, Respondent,**

v.

**DAHLKE TRAILER SALES, INC., Appellant.**

**A15-1183**

Supreme Court of Minnesota.

Filed: June 28, 2017

Joshua A. Newville, Madia Law LLC, Minneapolis, Minnesota, for respondent.

Todd L. Nissen, Drawe & Maland, Edina, Minnesota, for appellant.

Justin D. Cummins, Cummins & Cummins, LLP, Minneapolis, Minnesota, for amicus curiae Employee Lawyers Association of the Upper Midwest.

Jenny M. Helling, Emma R. Denny, Fabian May & Anderson, PLLP, Minneapolis, Minnesota; Brian T. Rochel, Douglas A. Micko, Teske Micko Katz Kitzer & Rochel, PLLP, Minneapolis, Minnesota; and Frances E. Baillon, Baillon Thome Jozwiak & Wanta, LLP, Minneapolis, Minnesota, for amicus curiae National Employment Lawyers Association-Minnesota Chapter.

## OPINION

CHUTICH, Justice.

Respondent Anibal Sanchez sued appellant Dahlke Trailer Sales, Inc. (Dahlke) under the antiretaliation provision of the Minnesota workers' compensation statute. Minn. Stat. § 176.82, subd. 1 (2016). The district court granted summary judgment to Dahlke, concluding that Sanchez had not raised a genuine issue of material fact about whether Dahlke discharged him because he sought workers' compensation benefits. The court of appeals reversed. *Sanchez v. Dahlke Trailer Sales, Inc.*, No. A15-1183, 2016 WL 3129352 (Minn.App. June 6, 2016). Before this court, Dahlke asserts that the court of appeals unduly expanded the scope of the workers' compensation antiretaliation statute and that Sanchez's claim is preempted by federal immigration law. We affirm the court of appeals. We hold that Sanchez raised a genuine issue of material fact as to whether Dahlke discharged him and as to whether the discharge was motivated by Sanchez seeking workers' compensation benefits. We further hold that federal immigration law does not preempt Sanchez's claim. Accordingly, we remand to the district court for further proceedings.

## FACTS

The summary judgment standard requires us to view the facts in the light most favorable to the nonmoving party, Sanchez. *State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 883 (Minn. 2006). Anibal Sanchez was born in Mexico. He entered the United States in 1998, with a tourist visa, and he has lived here without documentation since the visa expired. Sanchez bought a false social security number with the intention to apply for jobs. He presented the false social security number to Dahlke when he was hired in early 2005. Sanchez worked for Dahlke as a body shop assistant for about eight years, until December 20, 2013.

Sanchez alleged that his managers at Dahlke knew for the majority of his employment that he was not authorized to work in the United States. He testified that people at Dahlke started to ask him about his "legal situation" about two years after he was hired. He described several instances in which managers at Dahlke

made statements about his undocumented status.[1] Sanchez also alleged that Dahlke received annual notices from the Social Security Administration, stating that the social security number that Sanchez provided did not match his name.

On September 23, 2013, Sanchez injured himself while operating a sandblaster at work. Dahlke sent him to the hospital and made a first report of injury to its workers' compensation insurance carrier. Sanchez missed work and incurred medical expenses. He testified that, after he went back to work, he was told that he had to submit copies of his medical bills before he could receive lost-wages benefits.

Sanchez hired a lawyer to give him advice about the process. He testified that when he told Doug Smithers, a part-owner and service manager at Dahlke, that he had a lawyer, Smithers responded that he hated lawyers and said, "[T]he bridge between us [is] broken." Through his lawyer, Sanchez filed a workers' compensation claim petition on November 6, 2013. That claim has since settled.

During a deposition about his workers' compensation claim on December 11, 2013, Dahlke's lawyer asked Sanchez whether he was legally authorized to work in the United States. Sanchez responded that he was not. One or two days later, when he returned to Dahlke, Doug Smithers asked to see Sanchez's social security card and asked Sanchez whether he was "illegal." Sanchez responded: "Douglas, you know that." Sanchez testified that Smithers told him that he could not work for Dahlke anymore "because of [his] legal situation."

About one week later, Sanchez and two part-owners, Brian Dahlke and Doug Smithers, signed a letter stating:

> Because you voluntarily told us that the social security card documentation you provided us was not good and that you are not eligible to work in the United States at this time, we are sending you home on an unpaid leave of absence. Once you provide us with legitimate paperwork showing that you can legally work in the United States, you can come back to work at Dahlke Trailer Sales.

Sanchez later testified that he read the letter "without being aware of what [he] was signing." He also testified that he would "absolutely" go back to work at Dahlke if he could get legal authorization. Sanchez returned to Dahlke only once, to pick up his tools.

Sanchez brought suit in Anoka County District Court, raising a claim under the workers' compensation antiretaliation statute.[2] Minn. Stat. § 176.82 (2016). Dahlke moved for summary judgment, and the district court granted its motion. Because Sanchez acknowledged that he could return to Dahlke if he became legally author-

---

1. Sanchez stated in an affidavit and confirmed in his deposition that Doug Smithers—a part-owner and service manager at Dahlke—made fun of him after President Obama was elected in 2008, saying, "Obama—he's your brother—he's going to get you your papers now." In his affidavit, Sanchez also stated that he referred a friend to apply for work at Dahlke in 2009 or 2010, and that part-owner Brian Dahlke asked him, "Is he illegal like you or does he have papers?" Sanchez testified in his deposition that Greg Welcome, another part-owner and manager, called him into his office in 2012 and asked if he was "illegal." Sanchez told him that he was.

2. Sanchez also alleged national origin discrimination under the Minnesota Human Rights Act. See Minn. Stat. § 363A.08 (2016). He later dropped that claim. The complaint also made a claim of intentional obstruction of benefits under the workers' compensation statute, but Sanchez forfeited it by failing to argue the claim in any subsequent briefs. See Melina v. Chaplin, 327 N.W.2d 19, 20 (Minn. 1982).

ized to work, the district court found as a matter of law that his unpaid leave was a result of his immigration status, not his workers' compensation claim. Additionally, although acknowledging that "placing Plaintiff on unpaid leave might seem as if Dahlke was effectively firing Plaintiff," the court reasoned that Dahlke was simply complying with federal law prohibiting employers from knowingly employing undocumented workers.

The court of appeals reversed. *Sanchez v. Dahlke Trailer Sales, Inc.*, No. A15-1183, 2016 WL 3129352, at *3 (Minn.App. June 6, 2016). The court held that undocumented workers are protected by the antiretaliation provision of the workers' compensation law. *Id.* at *2 (citing *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 328 (Minn. 2003)). The court of appeals also held that Sanchez had raised a genuine issue of material fact on whether he had established a prima facie case of retaliatory discharge. *Id.* at *2-3. The court of appeals concluded that genuine issues of material fact existed regarding Sanchez's claim "that must be further developed and determined in the first instance by the district court," and remanded the case to the district court for further proceedings. *Id.* at *4. We granted Dahlke's petition for review.

## ANALYSIS

■ The district court may grant summary judgment if "there is no genuine issue as to any material fact" so that one party is "entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Our court reviews the district court's decision to grant summary judgment de novo. *Stringer v. Minn. Vikings Football Club, LLC*, 705 N.W.2d 746, 754 (Minn. 2005). We consider two questions: "whether a genuine issue of material fact exists, and whether an error in the application of the law occurred." *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn. 1995). Again, the evidence must be viewed in the light most favorable to the nonmoving party, Sanchez. *See Aquila Inc.*, 718 N.W.2d at 883.

Minnesota Statutes section 176.82, subdivision 1, prohibits an employer from "discharging ... an employee for seeking workers' compensation benefits." Dahlke is entitled to summary judgment, then, if it establishes that no genuine dispute exists as to the material facts: (1) whether Dahlke discharged Sanchez within the meaning of the statute, and (2) whether Dahlke did so in retaliation for Sanchez seeking workers' compensation benefits.[3] Dahlke also argues that, even if it is not entitled to summary judgment, federal immigration law preempts Sanchez's claim.

## I.

■ The court of appeals determined that a genuine issue of material fact existed as to whether Dahlke subjected Sanchez to an "adverse employment action"

3. The district court and the court of appeals analyzed Sanchez's claim under the *McDonnell Douglas* burden-shifting framework, which is commonly applied to summary judgment determinations in employment discrimination cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see, e.g., Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542-49 (Minn. 2001) (applying the burden-shifting framework to a summary judgment motion under the Minnesota Human Rights Act). The parties have not directly addressed the issue of whether it is appropriate to apply this framework to a workers' compensation retaliatory discharge claim. *See* Minn. Stat. § 176.82, subd. 1. We do not apply the *McDonnell Douglas* framework here, but rather reserve the question of whether the framework is appropriate for a workers' compensation retaliatory discharge claim for another day.

because his unpaid leave was a "material change in the terms or conditions" of his employment. *Sanchez*, 2016 WL 3129352, at *3 (quoting *Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 842 (Minn.App. 2007), *rev. denied* (Minn. Aug. 7, 2007)). But Minnesota Statutes section 176.82, subdivision 1, prohibits only a narrow range of conduct: discharge, threatened discharge, and intentional obstruction of benefits. The question here is whether Dahlke discharged Sanchez. Dahlke argues that placing Sanchez on unpaid leave until he can provide legitimate work documents does not qualify as a discharge.

 The workers' compensation statute does not define "discharge" or "discharging." *See* Minn. Stat. §§ 176.001-.862 (2016). To decide whether a genuine issue of material fact exists concerning whether Sanchez was discharged, we must first determine the word's meaning within the workers' compensation antiretaliation statute. When interpreting a statute, "we give words and phrases their plain and ordinary meaning." *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 759 (Minn. 2010) (citing Minn. Stat. § 645.08 (2016)).

*The American Heritage Dictionary* defines "discharge," in part, as "[t]o release, as from confinement, care, or duty" or "[t]o remove from office or employment." *The American Heritage Dictionary of the English Language* 514 (5th ed. 2011); *see also Webster's Third New International Dictionary of the English Language* 644 (2002) (defining "discharge," in part, as "to dismiss from employment: terminate the employment of," or "to end formally the service of: release from duty"). Interpreting the term in an employment contract,

our court has defined "discharge" as "the termination of employment at the will of the employer with prejudice." *Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 84 N.W.2d 593, 598-99 (1957). In *Anderson*, we concluded that a layoff was not a discharge because it was only temporary. *Id.* at 599; *see also Neid v. Tassie's Bakery*, 219 Minn. 272, 17 N.W.2d 357, 358 (1945) (interpreting "discharge" in an employment contract and finding that a "temporary cessation of operations was not a discharge").

 These sources show that the plain and ordinary meaning of discharge includes an aspect of permanence. *See Neid*, 17 N.W.2d at 358 ("A discharge presumptively means that the employer no longer needs or desires the employee's services; that he is done with him; and that all contract relations between them are at an end."); *see also* Minn. Stat. § 268.095, subd. 5 (2016) (defining discharge in the unemployment compensation context as occurring "when any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity"). This determination does not mean that a revival of the employment relationship must be impossible or inconceivable—any employer that discharges an employee could conceivably hire him back, and this possibility would not change the nature of the initial discharge.[4] Rather, an employer discharges an employee when the employer ends the employment relationship between them with no intention to resume it.

 The actual intent of the employer is key in deciding whether a discharge

4. Indeed, the equitable remedy for improper discharge in other contexts is reinstatement, which is a revival of the employment relationship. *See, e.g., Mathieu v. Gopher News Co.*, 273 F.3d 769, 782 (8th Cir. 2001) (referring to reinstatement as "the preferred equitable remedy" for discriminatory termination). But subsequent reinstatement does not mean that the employee was never discharged.

occurred, because the employer is the party with the greatest control over the employment relationship. The employer can make the ultimate decision whether to hire the person back—that is, whether the termination is with prejudice. If an employer places an employee on a "temporary" leave, but intends that the leave should never end, then the employer is really discharging the employee. The focus on the employer's actual intent prevents employers from avoiding a retaliation charge by simply attaching a different label to what is in reality a discharge.[5]

Dahlke asserts that it did not discharge Sanchez when it placed him on unpaid leave, because Sanchez can return to his job once he presents legal authorization to work in the United States. As support, it points to the letter—signed by Sanchez and two part-owners of Dahlke—stating that Sanchez "can come back to work at Dahlke" once he provides adequate documentation.

But, taking the facts in the light most favorable to Sanchez, there is reason to doubt that Dahlke ever intended to rehire Sanchez, regardless of any change in his work status.[6] Sanchez asserts that Dahlke was not actually motivated by his immigration status because Dahlke had known for years that he was undocumented. Sanchez's testimony describes numerous interactions with Dahlke managers showing that they were aware of his immigration status long before he filed his workers' compensation claim. Further support comes from the questionable circumstances of Sanchez's initial deposition; Sanchez argues that Dahlke's attorney deliberately asked him about his immigration status—despite its limited legal relevance to the claim for workers' compensation benefits—to furnish Dahlke with a nondiscriminatory reason to terminate Sanchez's employment. If Dahlke's motivation for placing Sanchez on leave was retaliatory, it implies that Dahlke intended the unpaid leave to be permanent.[7]

The dissent submits that "an employer's subjective desire that an employee never return to work" is irrelevant in the context of a contractual employment relationship. This argument misses the point. Even if Sanchez were to obtain legal work status, Dahlke would still have the ultimate choice whether to re-employ him. Dahlke's promise to rehire Sanchez once he gains legal work status did not include mutual consid-

5. The dissent acknowledges that attaching an impossible or irrelevant condition to a leave of absence may be a discharge. But the logical force of that distinction comes from what it conveys. An impossible or ridiculous condition imposed on a leave of absence simply conveys that the employer does not intend for the leave to end and that the condition does not actually matter to the employer. That question—the question of the employer's actual intent—is what must be decided in Sanchez's case.

6. We disagree with the dissent that "all the evidence in the record indicates that Dahlke is willing to continue to employ Sanchez if he can demonstrate his eligibility to return to active employment." Significantly, Dahlke is not contractually bound by the letter, which lacked consideration. Although Sanchez testi-

fied that he would go back to work at Dahlke if he obtained the necessary paperwork, that does not necessarily mean that Dahlke would accept him. Evidence in the record also suggests that Dahlke was motivated by retaliation in placing Sanchez on leave, rather than by his immigration status; this evidence is indirect evidence that Dahlke's offer to re-employ Sanchez was not legitimate.

7. The employer may well have known that Sanchez faces major obstacles to obtaining legal work status. *See, e.g., Arizona v. United States*, 567 U.S. 387, 404-05, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (citing 8 U.S.C. § 1255(c)(2), (c)(8)) ("With certain exceptions, aliens who accept unlawful employment are not eligible to have their status adjusted to that of a lawful permanent resident.").

eration and may not be binding. And because the condition in the letter has not occurred, and perhaps will never occur, the key to determining whether Sanchez was discharged is in determining whether Dahlke intended the leave to be permanent.

In the end, the question of whether Dahlke intended Sanchez's unpaid leave to be permanent is a factual dispute, to be resolved by a factfinder. Thus, Sanchez has raised a genuine issue of material fact as to whether he was discharged.

## II.

■■■ The second element of a workers' compensation retaliatory discharge claim is whether Dahlke discharged Sanchez "for seeking workers' compensation benefits." Minn. Stat. § 176.82, subd. 1. Sanchez testified that, after he retained a lawyer for his workers' compensation case, part-owner and service manager Smithers said he hated lawyers and that their "bridge" was "broken." Again, Dahlke asserts that in placing Sanchez on leave it was motivated only by its discovery that Sanchez did not have legal authorization to work in the United States. Sanchez claims that Dahlke had been aware of his immigration status for years. Viewed in the light most favorable to Sanchez, the evidence in the record raises a genuine issue of material fact regarding Dahlke's motivation for placing Sanchez on unpaid leave.

## III.

■■■ Dahlke also contends that the federal Immigration Reform and Control Act required it to place Sanchez on leave and that Dahlke cannot be held liable for taking an action required by federal law. The Immigration Reform and Control Act of 1986 (the IRCA), Pub. L. No. 99-603, 100 Stat. 3359 (2012), is codified as amended in various sections of Title 8 of the United States Code. As a part of "a comprehensive scheme that made combating the employment of illegal aliens in the United States central to the policy of immigration law," the IRCA establishes an extensive employment verification system. *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 138, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002); *see* 8 U.S.C. § 1324a (2012).

The IRCA requires employers to check citizenship or immigration status by requesting and examining the documentation of all employees. 8 U.S.C. § 1324a(b). The IRCA prohibits employers from knowingly hiring undocumented workers and from continuing to employ workers whom the employer knows to be undocumented. *Id.* § 1324a(a). Employers that unlawfully employ undocumented workers are subject to civil and criminal sanctions. *Id.* §§ 1324a(e)(4)-(5), (f). The federal act also makes it unlawful for any applicant to subvert the verification system by submitting fraudulent documentation. *See* 8 U.S.C. § 1324c(a) (2012).

■■■ The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under this principle, Congress has the power to preempt state law.

■■■ A preemption analysis starts from the assumption "that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Standing at the intersection of labor law and tort law, workers' compensation laws firmly qualify as an area of traditional state power. *See DeCanas v. Bica*, 424

U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (citing workers' compensation laws as an example of states' "broad authority under their police powers to regulate the employment relationship to protect workers within the State"), *abrogated on other grounds by Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582, 590, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011). As a result, a workers' compensation law will not be preempted except by the clear and manifest intent of Congress. *See Arizona*, 567 U.S. at 400, 132 S.Ct. 2492.

■ Federal law may preempt state law in three ways: (1) by express provision, (2) by occupying the entire regulatory field, or (3) by conflicting with state law. *See id.* at 399-400, 132 S.Ct. 2492. Dahlke's argument focuses solely on the third form, conflict preemption.

■ Conflict preemption can occur in two ways. First, a state law conflicts with a federal law when it is "impossible for a private party to comply with both state and federal requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Second, a state law conflicts with federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)) (internal quotation marks omitted). "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (citing *Silkwood v.*

*Kerr–McGee Corp.*, 464 U.S. 238, 256, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).

Dahlke's main preemption argument is that, if the workers' compensation antiretaliation statute requires it to continue to employ Sanchez even after becoming aware of his immigration status, then the statute requires exactly what the IRCA prohibits: knowingly employing an undocumented worker. Dahlke's argument rests on a flawed premise, however. The workers' compensation antiretaliation statute does not *require* that Dahlke continue to employ an employee after becoming aware that he is undocumented. Rather, it *prohibits* Dahlke from discharging an employee because he sought workers' compensation benefits. Minn. Stat. § 176.82, subd. 1. The retaliatory discharge provision does not require employment, but instead focuses on of a particular motivation: the employer is liable only if it discharged the employee "for seeking workers' compensation benefits." *Id.*

Because of this retaliatory-motive requirement, it is possible for an employer in Dahlke's position to comply with the workers' compensation antiretaliation statute without running afoul of the IRCA. Dahlke would have followed the IRCA without violating the antiretaliation statute if it discharged Sanchez because of his immigration status, and not because of his protected activity.[8] Thus, it is possible for a private party to comply with both statutes.

The dissent agrees that Dahlke's compliance with both statutes is "theoretically possible," but determines that federal preemption law requires more. We disagree. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011)

---

8. This analysis assumes that the plaintiff does not pursue a mixed-motive theory of discrimination. Sanchez has not argued that Dahlke had a mixed motive for discharging him, and

we do not opine on the question of whether a plaintiff may pursue a workers' compensation retaliation claim under a mixed-motive theory.

("The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."). The dissent's exploration of circumstances under which Dahlke could have violated one or both statutes, no matter how likely those circumstances, does not change the fact that compliance with both statutes is possible. We decline to expand the standard for conflict preemption by impossibility, especially in an area of traditional state control. *See Forster v. R.J. Reynolds Tobacco Co.*, 437 N.W.2d 655, 658 (Minn. 1989) ("Under our system of federalism, it is assumed that Congress in legislating does not intend to hobble the states in their regulation of matters of state concern.").

 Finally, the workers' compensation antiretaliation statute does not stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S.Ct. 399. The IRCA is premised on the conclusion that "[e]mployment is the magnet that attracts aliens here illegally." H.R. Rep. No. 99-682(I), at 46 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5650. To reduce the pull of that magnet, the IRCA uses criminal and civil penalties to discourage employers from hiring unauthorized aliens. *Hoffman*, 535 U.S. at 155, 122 S.Ct. 1275 (Breyer, J., dissenting).

In *Correa v. Waymouth Farms, Inc.*, we considered whether the IRCA, "or the policy behind it, prevents unauthorized aliens from conducting a diligent job search," a requirement for receipt of temporary total disability benefits under the Workers'

Compensation Act. 664 N.W.2d at 327; *see* Minn. Stat. § 176.101, subd. 1(g) (2016) (conditioning temporary total disability benefits on a diligent search "for appropriate work within the employee's physical restrictions"). Correa was not authorized to work in the United States, and the employer argued that this status prevented him from conducting a diligent search for appropriate work as a matter of law. *Correa*, 664 N.W.2d at 327. We rejected the employer's argument, holding that the workers' compensation statute covers undocumented workers and that the IRCA "is not aimed at impairing existing state labor protections." *Id.* at 329.

 The *Correa* court noted in dicta that "to the extent that denying unauthorized aliens benefits predicated on a diligent job search gives employers incentive to hire unauthorized aliens in expectation of lowering their workers' compensation costs, the purposes underlying the IRCA are not served." *Id.* at 331 n.4. Enforcing labor laws against employers that employ undocumented workers does not stand as an obstacle to the purpose of the federal immigration law.[9] Rather, such enforcement *furthers* the IRCA's goal of discouraging employers from hiring unauthorized aliens. If the workers' compensation antiretaliation statute does not apply to employers of undocumented workers, then those employers are in a position to save costs, especially in borderline cases in which they can plausibly claim ignorance of an employee's immigration status until after he or she becomes injured at work.

---

**9.** We take the dissent's point that this dictum in *Correa* is not binding. Nonetheless, we find its reasoning persuasive, especially because it addresses the interplay between the same two statutes that are currently at issue. And, as the dissent acknowledges, *Hoffman*—a 5-4 decision about the conflicting federal aims of the National Labor Relations Act and the IRCA—

is also not binding in this preemption case. Like *Correa*, the reasoning in *Hoffman* is useful insofar as it is applicable and persuasive. We see nothing in the *Hoffman* majority opinion that rejects our simple conclusion: that the IRCA aims to reduce illegal immigration, in part, by preventing employers from hiring undocumented workers.

Because the IRCA's aim is to discourage employment of undocumented workers, removing labor protections would undermine that goal by making the employment of undocumented workers cost-effective. We therefore hold that the workers' compensation antiretaliation statute does not conflict with the IRCA, either by prohibiting conduct that the IRCA requires or by standing as an obstacle to the aims of Congress.[10]

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals and remand to the district court for further proceedings in accordance with this opinion.

Affirmed.

Dissenting, Anderson, J., Gildea, C.J., Stras, J.

## DISSENT

ANDERSON, Justice (dissenting).

Respondent Anibal Sanchez testified under oath, on the record, and in the presence of attorneys representing himself and his employer, that he was not legally authorized to work in the United States. Shortly thereafter, he confirmed this fact directly to the ownership of his employer, appellant Dahlke Trailer Sales, Inc. It is undisputed that at that point, Dahlke's duty was clear: consistent with federal law, it could not actively employ Sanchez. 8 U.S.C. § 1324a(a)(2) (2012) (prohibiting employers from continuing to employ workers whom the employer knows to be undocumented). To do so would incur civil and criminal sanctions under federal immigration law. *Id.* §§ 1324a(e)(4)-(5), 1324a(f) (2012). Dahlke obeyed federal law and informed Sanchez that he could not report to work until he was authorized to do so. In my view, that action did not constitute a "discharge" under the antiretaliation provision of Minnesota's workers' compensation law, Minn. Stat. § 176.82 (2016). Regardless, to the extent that Dahlke's actions subject it to liability under Minnesota law, it is liable only because it was impossible for Dahlke to comply with both the antiretaliation provision and federal immigration law. Moreover, granting Sanchez a remedy for Dahlke's compliance with federal law stands as an obstacle to the accomplishment and execution of federal immigration law. I would therefore conclude that federal law preempts Minnesota's antiretaliation provision. Accordingly, I dissent.

## FACTS

As the court did, and as the summary judgment standard requires, I review the facts in the light most favorable to the nonmoving party. *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 847 (Minn. 1995). Born in Mexico, Sanchez entered the United States in 1998 under a tourist visa. Since the visa expired, he has lived in the United States without authorization. He has never applied to the United States government for documentation allowing him to work legally.

10. We do not opine on the question of whether the IRCA preempts the award of actual or punitive damages to an undocumented worker. It would be premature, before any finding of liability, and without any substantial briefing or analysis, to address that question now. But we do note that the damages available under the workers' compensation antiretaliation statute—including actual damages, punitive damages, and attorney fees—are broader than the backpay award reversed in *Hoffman*. Compare Minn. Stat. § 176.82, subd. 1 (providing for recovery of "damages incurred by the employee ... including costs and reasonable attorney fees, and for punitive damages"), *with Hoffman*, 535 U.S. at 141-42, 122 S.Ct. 1275 (discussing National Labor Relations Board's backpay award).

Sanchez has a social security card that he bought from somebody "out and about" so he could work. In early 2005, Dahlke contacted a local technical school to inquire about hiring one of its students as a body shop assistant. The school recommended Sanchez, and Dahlke subsequently hired him. When Sanchez applied to work at Dahlke, he said that he could work legally in the United States. He supplied Dahlke with his fake social security card and a copy of his Minnesota driver's license. In so doing, Sanchez violated federal immigration law prohibiting the use of forged documents, or documents issued to another, to obtain employment in the United States. *See* 8 U.S.C. § 1324c(a) (2012).

Sanchez worked for Dahlke for almost nine years. Sanchez alleges that for most of this period, Dahlke was aware of his status as an undocumented worker, but nevertheless continued to employ him. In opposing Dahlke's motion for summary judgment he presented evidence in support of that contention. Taken in the light most favorable to Sanchez, that evidence creates a genuine issue of material fact about whether Dahlke was aware that Sanchez was not authorized to work in the United States.[1] If Dahlke was so aware, its continued employment of Sanchez was also in violation of federal immigration law. *See* 8 U.S.C. § 1324a(a)(2).

In 2013, Sanchez was injured while operating a sandblaster at work. A Dahlke employee drove Sanchez to the hospital and, on the same day, filed a workers' compensation claim for him with Dahlke's insurer. After the accident, Sanchez missed some work. He contacted Dahlke's workers' compensation insurer, which told him that he must first send the bills for his treatment before it could process the disability request. Sanchez did not know whether the insurer was advising him accurately, so he retained a lawyer.

Through his counsel, Sanchez filed a workers' compensation claim petition. The insurer retained defense counsel and adjusted the claim. Dahlke was upset that Sanchez retained counsel; one of Dahlke's owners stated that he hated lawyers and that "the bridge between us [is] broken." Sanchez was deposed, and during that deposition Sanchez was asked whether he was authorized to legally work in the United States. He testified under oath that he was not.

Shortly thereafter, two of Dahlke's owners confronted Sanchez with his deposition transcript. Sanchez told them that he did not lie during his deposition. Sanchez told one of the owners to "do what you have to do." Sanchez then met with one of Dahlke's owners and the company bookkeeper, who had copies of documentation Sanchez had previously provided to Dahlke. Sanchez indicated that the social security card he had provided was no good, and confirmed that he had no legitimate paperwork.

Dahlke provided Sanchez with a letter, stating that he was being "sen[t] ... home on an unpaid leave of absence." The letter further stated: "Once you provide us with legitimate paperwork showing that you can legally work in the United States, you can come back to work at Dahlke Trailer Sales." Sanchez signed the letter. Sanchez claims that he was required to sign the document without knowing what he was signing, and without being given time to take the statement home to review it. Sanchez then filed this action.

In his deposition, Sanchez testified that he understands that if he provides Dahlke with legitimate paperwork, he can return

1. Dahlke maintains that it first learned that Sanchez was not authorized to work in the United States during his deposition testimony to that effect.

to work for Dahlke. Dahlke has represented that Sanchez need not reapply or interview again before returning; he has a job to come back to if he obtains the proper documentation to work in the United States. Sanchez has settled his workers' compensation claim and received compensation for the sandblaster accident. He testified that he would return to work for Dahlke if he could get legal authorization, and that he was planning to apply for work status.

## ANALYSIS

### I.

Sanchez claims that Dahlke has violated Minn. Stat. § 176.82, subd. 1, which in relevant part prohibits an employer from "discharging ... an employee for seeking workers' compensation benefits." Dahlke argues, and the district court concluded, that by putting Sanchez on unpaid leave, it did not "discharge" him. By contrast, Sanchez argues—and the court agrees—that under the circumstances of this case, it is a jury question whether putting Sanchez on unpaid leave amounted to "discharging" him. As the court notes, the workers' compensation statute does not define "discharge" or "discharging." But we have. The meaning of "discharge" in this context is provided by our decision in *Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 84 N.W.2d 593 (1957), which arose in the context of a labor agreement. We noted that the word "discharge," which appeared in the agreement, "in common parlance and in industrial parlance ha[s] a normal meaning" that is distinct from the meaning of the term "layoff." *Id.* at 597-98. We defined "discharge" to mean "a termination of employment at the will of the employer with prejudice." *Id.* at 598-99. By contrast, a layoff is a termination of employment *without* prejudice. *See id.* at 598-99.

As support for this proposition in *Anderson*, we referred to a number of authorities, including *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 287 n.11, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946). *Fishgold* in turn cited to the Oxford English Dictionary, which defined a layoff, in part, as "[a] period during which a workman is temporarily dismissed or allowed to leave his work." *Id. Anderson* emphasized that, unlike a discharge, a layoff is impermanent. 84 N.W.2d at 598 ("A removal implies permanent separation from the service, while a suspension or layoff implies a temporary separation from the service." (quoting *State ex rel. Ausburn v. City of Seattle*, 190 Wash. 222, 67 P.2d 913, 921 (Wash. 1937))). And, most notably for the current distinction, we quoted at length from *International Ass'n of Machinists v. State ex. rel. Watson*, 153 Fla. 672, 15 So.2d 485 (1943). That case distinguished "discharge"—which it defined as "termination of employment at the will of the employer, *with prejudice*," *id.* at 490 (emphasis added)—from "lay-off," defined as "termination of employment at the will of the employer, *without prejudice* to the worker," *id.* (emphasis added). The court purports to accept this definition.

Even taking the evidence in a light most favorable to Sanchez, all the evidence in the record demonstrates that when Dahlke put Sanchez on an unpaid leave of absence, it ended his employment without prejudice; Sanchez was permitted to return to employment with Dahlke when he met the most basic of conditions: legal eligibility to work. The letter Dahlke provided to Sanchez, which was signed by two of Dahlke's owners, spells this out:

> Because you voluntarily told us that the social security card documentation you provided us was not good and that you are not eligible to work in the United States at this time, we are sending you

home on an unpaid leave of absence. *Once you provide us with legitimate paperwork showing that you can legally work in the United States, you can come back to work at Dahlke Trailer Sales.* (Emphasis added.) In addition, Sanchez testified that he understands that if he provides Dahlke with legitimate paperwork, he can start actively working for Dahlke again.

In short, all the evidence in the record indicates that Dahlke is willing to continue to employ Sanchez if he can demonstrate his eligibility to return to active employment. The court's protestations to the contrary are unpersuasive.[2] Thus, the "intent of the employer" question the court poses has already been answered here. To be sure, it is unclear whether Sanchez will ever be able to obtain the proper documentation, but that does not convert Dahlke's layoff of Sanchez into a discharge or make the condition impossible. The court nevertheless concludes that the layoff was really a discharge based on the employer's subjective intention "that the leave should never end." It is unclear what, precisely, the court means by this statement, but I see two possibilities. Each, however, is flawed.

First, the court might mean that an employer who wishes to discharge an employee could do so pretextually by placing the employee on leave, subject to an impossible or unreasonable condition for the leave to end. "Any form of words which conveys to the servant the idea that his services are no longer required is sufficient to constitute a discharge." *Neid v. Tassie's Bakery*, 219 Minn. 272, 17 N.W.2d 357, 358 (1945) (citing *Johnson v. Crookston Lumber Co.*, 100 N.W. 225 (Minn. 1904)). As an extreme example, an employer might place an employee on leave, with the condition that the employee can return to work when the employee can perform a double back flip. For nearly all employees, this condition would be impossible and completely unrelated to their job duties. Under such circumstances, a condition of this type might amount to a discharge.

But those circumstances are clearly not present here. The requirement that Sanchez be authorized to legally work in the United States before being allowed to return his job is, of course, linked inextricably to his job. Indeed, it is difficult to imagine a more foundational qualification for any employee. And regardless of whether Sanchez faces "major obstacles" to obtaining legal work status (as the court describes it), the record does not support a claim by Sanchez that it was *impossible* for him to obtain legal status, or, even

---

**2.** It is unclear what consideration the court has in mind that might apply to these circumstances. The court notes that the letter was not an enforceable contract because it was not given for consideration. This assertion is irrelevant: even under the court's theory it is the employer's subjective intention—not the existence of an enforceable promise—that controls. If Sanchez had given consideration in exchange for Dahlke's promise to allow him to come back to work, it is unclear how that would bear on Dahlke's subjective intention.

The court also argues that evidence in the record suggesting that Dahlke's decision to place Sanchez on leave was retaliatory also suggests that Dahlke's layoff decision was pretextual. I disagree. The evidence is Sanchez's testimony (contradicted by Dahlke) that Dahlke knew of his immigration status long before he filed his worker's compensation claim. Even accepting that evidence as true (as we must in this posture), Dahlke's unwillingness to continue to turn a blind eye to Sanchez's lack of work authorization does not suggest that Dahlke would terminate Sanchez if he actually obtains proper authorization. To the contrary, it suggests that Dahlke would be willing to have Sanchez work again once he obtains appropriate authorization. The leap in logic here is by the court, not the dissent.

more importantly, that *Dahlke knew* it was impossible. Instead, Dahlke simply did not know (and could not control) whether Sanchez could obtain legal status, but its duty not to employ him until he could obtain that status was clear. Under those circumstances, there is no reason to construe Dahlke's written statement—supplemented by Sanchez's testimony and Dahlke's representations—that Sanchez was welcome to resume working at Dahlke when he could do so lawfully, as something other than leave.

Second, in asking whether the employer "intends that the leave should never end," the court may be suggesting that an employer's subjective desire that an employee never return to work is somehow relevant. But there is no reason to believe that an otherwise legitimate layoff somehow becomes a discharge because of an employer's hope about some future event. The employment relationship is contractual, and the difference between a layoff and a discharge turns on whether the contract relationship is over. *Neid*, 17 N.W.2d at 358 ("A discharge presumptively means that the employer no longer needs or desires the employe's [sic] services; that he is done with him; and that all contract relations between them are at an end." (citing *Stitt v. Locomotive Eng'rs' Mut. Protective Ass'n*, 177 Mich. 207, 142 N.W. 1110, 1113 (1913))). In Minnesota, as in most states, issues of contract formation are governed by the objective conduct of the parties, not their subjective intent. *See SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011) ("Whether mutual assent exists is tested under an objective standard."); *Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 117 N.W.2d 213, 221 (1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively."). Even if Dahlke secretly hoped that Sanchez would never be able to produce

legal authorization to work—because it had a retaliatory animus against Sanchez, or for some other reason—neither Sanchez nor the court provides reason to believe that that secret hope would somehow nullify Dahlke's offer to Sanchez.

Put simply, Sanchez has pointed to no record evidence of anything Dahlke said or did that conveyed to Sanchez the idea that his services were no longer required. *See Neid*, 17 N.W.2d at 358. Accordingly, I would hold that the district court correctly granted summary judgment to Dahlke on the basis that Sanchez did not establish a genuine issue of material fact as to whether he was discharged from employment.

## II.

Even if one characterizes Dahlke's actions toward Sanchez as a discharge, however, Dahlke was required to take those actions by federal immigration law. Penalizing Dahlke for complying with federal law would create an irreconcilable conflict between the antiretaliation provision of the workers' compensation statute and federal immigration law. I would therefore hold that the antiretaliation provision is preempted.

The Immigration and Reform Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (2012) (codified as amended at 8 U.S.C. § 1324) (IRCA), presents a "comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002). "IRCA 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.'" *Id.* (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 & n.8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991)). Under IRCA, an employer is forbidden from hiring an employee who is

unable to present specified documents before beginning work. 8 U.S.C. § 1324a(a)(1), (b) (2012). "Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." *Hoffman*, 535 U.S. at 148, 122 S.Ct. 1275 (citing 8 U.S.C. § 1324a(a)(2) ("It is unlawful for a person or other entity ... to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.")). Violation of this requirement is punishable by both civil fines, 8 U.S.C. § 1324a(e)(4)(A), and criminal penalties, *id.* § 1324a(f)(1).

When Sanchez testified in his deposition that he was not authorized to work in the United States, and subsequently confirmed to Dahlke that his deposition testimony was truthful, Dahlke certainly knew that Sanchez was "an unauthorized alien with respect to ... employment" at Dahlke. *Id.* § 1324a(a)(2). Dahlke was therefore "compelled," *Hoffman*, 535 U.S. at 148, 122 S.Ct. 1275, to cease "continu[ing] to employ" him, 8 U.S.C. § 1324a(a)(2). Any other action would have violated IRCA. The court acknowledges this fact but nevertheless holds that it is a jury question whether Dahlke can be liable under our workers' compensation antiretaliation law for taking an action that was required by federal law. Because I believe IRCA preempts Minn. Stat. § 176.82, subd. 1, under these circumstances, I disagree.

The Supremacy Clause of the United States Constitution, which provides the basis for federal preemption of state law, declares that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. As the court recognizes, the relevant type of preemption is implied preemption, which comes in two forms. First,

when it is "impossible for a private party to comply with both state and federal requirements," the state and federal laws conflict, and the state law is preempted. *Angell v. Angell*, 791 N.W.2d 530, 535 (Minn. 2010) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)). Second, "when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" the state law is preempted. *Id.* (quoting *Freightliner*, 514 U.S. at 287, 115 S.Ct. 1483). Both situations obtain here.

First, after Dahlke learned, without any room for doubt, that Sanchez was not authorized to work in the United States, it was impossible for Dahlke to continue to actively employ Sanchez and still comply with IRCA. This is true *regardless* of its actual motives. Whether it secretly had desired to end Sanchez's employment and was simply seeking an excuse; whether it was infuriated by Sanchez's pursuit of a workers' compensation claim and seized upon his lack of work authorization as a fig leaf; or whether it very much wished to continue employing Sanchez and would have done so if its duty under ICRA had not been made crystal clear—in any and all of these situations, Dahlke was required under federal law to end its active employment of Sanchez. To penalize it for doing so under the workers' compensation antiretaliation law demonstrates the impossibility of complying with both laws at once.

The court attempts to find daylight between IRCA and the workers' compensation antiretaliation statute, suggesting that Dahlke may comply with both laws if it "discharged Sanchez because of his immigration status, and not because of his protected activity," i.e., seeking workers' compensation benefits. Although this distinction is theoretically possible, it defies reality. Dahlke was required by federal

law to cease employing Sanchez, and the record makes clear that it knew of that requirement. To imagine that, under these circumstances, Dahlke would have been motivated to unlawfully put Sanchez on leave out of a desire to retaliate against him, when it knew that it could put him on leave legitimately based on his employment status—indeed, was required to do so by federal law—is simply not believable.[3]

The parties argue that Dahlke made its decision for a single reason—either retaliatory animus (as Sanchez would have it) or the requirements of federal law (as Dahlke argues). The court tacitly endorses this binary approach, correctly noting that Sanchez has not argued that Dahlke had a mixed motive for discharging him, and therefore deeming it appropriate to isolate a single motive for the decision. But as we have noted, "[t]o some extent, every claim of disparate treatment raises questions of mixed motives." *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626 (Minn. 1988) (quoting *Anderson v. Hunter, Keith, Marshall & Co.*, 401 N.W.2d 75, 81 (Minn. App. 1987)). That is surely true in this case involving retaliation, in which there can be no question that Dahlke was prompted by the requirements of federal law. In cases under the Minnesota Human Rights Act, we have dealt with mixed motives by assigning liability if a forbidden motive is a "substantial causative factor entering into the decision," *id.* at 624, even if the employer would have made the same decision absent the unlawful motive, *id.* at 626. Assuming a similar approach to workers' compensation antiretaliation cases, an employer will violate the antiretaliation provision of the workers' compensation law if a desire to retaliate is a substantial causative factor of the decision.

Assuming, as we must on review of a grant of summary judgment, that Dahlke was upset by Sanchez's pursuit of a workers' compensation claim and fired him because of the claim, then it was *not* possible for Dahlke to comply with both state and federal law. If Dahlke indulged its desire to retaliate against Sanchez and discharged him, then on the court's theory the antiretaliatory animus is a "substantial causative factor entering into the decision," *id.* at 624, and Dahlke has likely violated the antiretaliation provision of our workers' compensation laws, but is compliant with federal law by continuing to employ Sanchez. This presents a classic case of conflict preemption.

Second, penalizing Dahlke under the antiretaliation provision of the workers' compensation law certainly stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in passing IRCA, as the Supreme Court of the United States explained in *Hoffman*. The *Hoffman* Court considered whether federal immigration policy, as expressed in IRCA, foreclosed the National Labor Relations Board from awarding backpay to an undocumented alien who, like Sanchez, had presented fraudulent

---

**3.** This argument, and most of the ones that follow, depends in part on the circumstances of this case, in which Dahlke knew that Sanchez was not authorized to work in the United States at the time it chose to cease employing him. The preemption analysis might be different if Dahlke had learned that Sanchez was unauthorized *after* firing him. *See Salas v. Sierra Chem. Co.*, 59 Cal.4th 407, 173 Cal. Rptr.3d 689, 327 P.3d 797, 800 (2014) (concluding that a California law "extend[ing] state law employee protections and remedies to all workers 'regardless of immigration status,' is not preempted by federal immigration law except to the extent it authorizes an award of lost pay damages for any period *after the employer's discovery of an employee's ineligibility to work in the United States*") (emphasis added).

documents and who, like Sanchez, was never legally authorized to work in the United States. 535 U.S. at 141, 122 S.Ct. 1275. The employer in *Hoffman* had fired the undocumented employee because he was a union supporter, in violation of the National Labor Relations Act, *see id.* at 140, 122 S.Ct. 1275—similar to Dahlke, which we must assume fired Sanchez because he filed a workers' compensation claim. Unlike the employer in *Hoffman*, which was ignorant of the employee's unauthorized status until after the employer fired him, *see id.* at 140-41, 122 S.Ct. 1275, here we must assume that Dahlke knew of Sanchez's unauthorized status prior to his injury. The Court held that federal immigration policy forbade the Board from granting backpay to the alien. *Id.* at 151-52, 122 S.Ct. 1275. The Court began its opinion by stating as follows:

> The National Labor Relations Board ... awarded backpay to an undocumented alien who has never been legally authorized to work in the United States. We hold that such relief is foreclosed by federal immigration policy, as expressed by Congress in [IRCA].

*Id.* at 140, 122 S.Ct. 1275. In reaching its decision, the Court discussed its previous decision in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), in which it "affirmed the Board's determination that the NLRA applied to undocumented workers." *Hoffman*, 535 U.S. at 144, 122 S.Ct. 1275 (citing *Sure-Tan*, 467 U.S. at 892, 104 S.Ct. 2803). But it observed that with the enactment of IRCA,

> Congress has expressly made it criminally punishable for an alien to obtain employment with false documents. There is no reason to think that Congress nonetheless intended to permit backpay where but for an employee's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities.

*Id.* at 149, 122 S.Ct. 1275 (footnote omitted). The Court concluded that awarding backpay to the unauthorized employee would "recogniz[e] employer misconduct but discount[ ] the misconduct of illegal alien employees" and thereby "subvert[ ]" IRCA. *Id.* at 150, 122 S.Ct. 1275. The Court concluded "that allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA." *Id.* at 151, 122 S.Ct. 1275.

In this case, the remedy sought is not an award of backpay to an undocumented worker by the Board, but rather damages awarded by a court. But the availability of a damages remedy has nearly the same effects.[4] Like an award of backpay based on a firing found to be an unfair labor practice, an award of damages to Sanchez for Dahlke's retaliatory discharge would compensate a former employee for time

---

4. The court states that it does not "opine on the question of whether the IRCA preempts the award of actual or punitive damages to an undocumented worker," but it is unclear, then, what the court thinks it is deciding. Minnesota Statutes § 176.82 is titled "Action for civil damages for obstructing employee seeking benefits," and provides, as relevant here, that a person who discharges an employee for seeking workers' compensation benefits "is liable in a civil action for damages incurred by the employee ... and for punitive damages." Minn. Stat. § 176.82, subd. 1. The statute mentions no other remedy except attorney fees, and we do not generally award attorney fees to a plaintiff who is entitled to *no* other relief. Other remedies such as reinstatement are obviously unavailable to a person in Sanchez's situation.

during which, but for the firing, Sanchez would have "continued to work illegally ... while successfully evading apprehension by immigration authorities." *Id.* at 149, 122 S.Ct. 1275.

Of course, *Hoffman* involved the interaction of immigration law with the Board's authority under the NLRA, rather than the interaction of immigration law and state law, and so preemption principles were not directly in play. But the Court's conclusion—that "allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA," *id.* at 151, 122 S.Ct. 1275—makes it clear that an award of damages to an employee who was not authorized to work in the United States would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as expressed in IRCA, *Angell*, 791 N.W.2d at 535 (quoting *Freightliner*, 514 U.S. at 287, 115 S.Ct. 1483). The court's analysis not only ignores *Hoffman*, but it also stands at the opposite pole from it.

The court instead relies on our decision in *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324 (Minn. 2003). But nothing in *Correa* addresses the situation we face here. Like Sanchez, Correa was unauthorized to work in the United States, but nevertheless found employment and suffered an injury on the job. *Id.* at 325-26. Like Dahlke, Correa's employer learned that Correa's eligibility information was false and requested valid documentation of his eligibility to work in the United States. *Id.* at 326. But unlike Sanchez, who was placed on an unpaid leave, when Correa informed his employer that he could not provide the requested information, it terminated his employment. *Id.* And unlike here, the issue in *Correa* was not whether the discharge was retaliatory, but rather whether Correa could conduct a "diligent job search," as required to receive temporary total disability benefits under Minn. Stat. § 176.101, subd. 1(g) (2016). *Correa*, 664 N.W.2d at 327.

As the court correctly notes, we stated in *Correa* that we were to consider whether IRCA "or the policy behind it, prevents unauthorized aliens from conducting a diligent job search." *Id.* But we never considered the policy behind IRCA. Instead, we analyzed IRCA's text and concluded that there was nothing that explicitly "prohibit[ed] unauthorized aliens from receiving state workers' compensation benefits generally or temporary total disability benefits conditioned on a diligent job search specifically." *Id.* at 329. And we analyzed the text of the workers' compensation law, again finding no explicit restriction. *Id.* at 329-30. We did not address the question of whether this court should adopt the reasoning of the Supreme Court of the United States in *Hoffman* and conclude that the federal immigration policy articulated in IRCA prohibits such an award. *Id.* at 330. Instead, after describing the reasoning of the *Hoffman* majority, *id.*, and its dissent, *id.* at 331, we stated:

> Because the IRCA does not preclude payment of temporary total disability benefits and the language of our Act is clear, *we do not have occasion to consider the policy question* [the employer] *urges us to address*. Therefore, we conclude that unauthorized aliens are entitled to receive temporary total disability benefits conditioned on a diligent job search.

*Id.* (emphasis added) (footnote omitted). We "left to the legislature" the job of considering "the policy questions raised by" the employer. *Id.*

Whether the policy expressed by Congress in IRCA will be impeded by enforcement of Minnesota law is, of course, the

principal inquiry in obstacle-preemption analysis, and so we must now face it squarely. The court aims to do so by citing a footnote in *Correa* for the proposition that if the retaliation provision is preempted, an employer might have increased incentives to hire unauthorized workers, knowing that it could later terminate those workers without fear of liability for retaliation. *Id.* at n.4. But not only was that footnote dicta, it also relied for its authority on the rationale expressed in the *dissenting* opinion in *Hoffman. Compare id.* ("We do, however, note that to the extent that denying unauthorized aliens benefits predicated on a diligent job search gives employers incentive to hire unauthorized aliens in expectation of lowering their workers' compensation costs, the purposes underlying the IRCA are not served."), *with Hoffman*, 535 U.S. at 155, 122 S.Ct. 1275 (Breyer, J., dissenting) (noting that denial of backpay "lowers the cost to the employer of an initial labor law violation . . . [and] thereby increases the employer's incentive to find and to hire illegal-alien employees."). That argument did not carry the day in *Hoffman*, and it is even less persuasive here.[5]

Notably, the employer's incentive at the time of hiring is not the only policy to consider. To be sure, there may be some incentive effect of the kind described by the court today (and in the *Hoffman* dissent): it makes economic sense that, at the thinnest edge of the margin, an employer may be more likely to hire an unauthorized employee that it knows it can fire without liability if the employee files a workers' compensation claim.[6] But the court's non-preemption result leads to *direct and real* incentives for an employer to knowingly violate immigration law. Consider Dahlke's situation: after learning beyond any doubt what may have previously been only a suspicion—that Sanchez was not authorized to work in the United States—it was faced with a choice. It could have either put Sanchez on leave (or fired him outright), or continued to employ him. If the antiretaliation law is preempted, Dahlke could have terminated Sanchez's employment in accordance with federal law. But under the court's decision, whether the employer puts Sanchez on leave or fires him, Dahlke would run the risk of either a retaliation lawsuit or violating federal law, incurring fines and criminal penalties. An employer who is solely concerned with the bottom line may judge that the risks of being caught on an IRCA violation are outweighed by the risks it faces from a

---

**5.** Although the interpretation of the workers' compensation antiretaliation provision is one of Minnesota law, whether that provision (as so interpreted) is preempted is a question of federal law. *See Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1304 (11th Cir. 2000) ("Although federal court jurisdiction is premised on diversity of citizenship, important federal law preemption issues will be presented for us to decide if, and only if, Spain's claims survive the multitude of state law arguments and defenses the defendants have raised."); *General Motors Corp. v. Cal. State Bd. of Equalization*, 815 F.2d 1305, 1308-09 (9th Cir. 1987) ("The preemption issue is one of federal law . . . ." (citing *Marshall v. Chase Manhattan Bank*, 558 F.2d 680, 683 (2d Cir. 1977))). Likewise, interpretation of

the federal immigration policy expressed by Congress is a matter of federal, not Minnesota, law. *See Arizona v. United States*, 567 U.S. 387, 395, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ("The federal power to determine immigration policy is well settled."). Thus, the court's statement that "the reasoning in *Hoffman* is useful insofar as it is applicable and persuasive" fails to give proper weight to precedent from the Supreme Court of the United States.

**6.** The employer's incentive to employ an unauthorized worker must, of course, be balanced against a corresponding *disincentive* for those workers to *accept* employment under those circumstances.

retaliation lawsuit, and choose to violate federal law.[7] Clearly, then, enforcement of the antiretaliation provision of the workers' compensation law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *English*, 496 U.S. at 79, 110 S.Ct. 2270 (quoting *Hines*, 312 U.S. at 67, 61 S.Ct. 399 (internal quotation marks omitted)), and accordingly that provision is preempted.

## CONCLUSION

For these reasons, I respectfully dissent.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Anderson.

STRAS, Justice (dissenting).

I join in the dissent of Justice Anderson.

---

7. These considerations were not present in *Hoffman* because the employer did not learn that the employee was undocumented until *after* it had already committed an unfair labor practice. 535 U.S. at 140-41, 122 S.Ct. 1275.